# EXHIBIT E

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MASSACHUSETTS - WORCESTER**

==============================

IN THE MATTER OF:        .  Case #08-40749 (JBR)

                             .

DIOMED, INC., et al         .  Worcester, Massachusetts

                             .  **June 2, 2008**

               Debtors   .  1:18:00 p.m. O'Clock

==============================

**TRANSCRIPT OF TELEPHONIC HEARING ON:**
**(#149) DEBTORS' MOTION FOR AN ORDER PURSUANT TO §§105, 363, 365, 1146**
**OF THE BANKRUPTCY CODE, BANKRUPTCY RULES 2002, 6004, 6006, AND 9014**
**AND MASSACHUSETTS LOCAL BANKRUPTCY RULE 6004-1 APPROVING AND**
**AUTHORIZING (A) THE SALE OF SUBSTANTIALLY ALL OPERATING ASSETS**
**FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER**
**INTERESTS, AND (B), THE ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES;**
**( #265) LIMITED OBJECTION OF THE SUBORDINATED SECURED CREDITORS;**
**(#269) OBJECTION THERETO;**
**(#288) SUPPLEMENT THERETO OF ENDOLASER ASSOCIATES, LLC;**
**(#270) PROTECTIVE OBJECTION OF THE CREDITORS' COMMITTEE;**
**FIFTH HEARING ON [#22] DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(1) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL AND**
**GRANTING ADEQUATE PROTECTION;**
**(#290) DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO REJECT**
**ENDOLASER LICENSE AGREEMENT PURSUANT TO SECTION 365(a) OF THE**
**BANKRUPTCY CODE**
**BEFORE THE HONORABLE JOEL B. ROSENTHAL, JR., J.U.S.B.C.**

**APPEARANCES:**   (See next page)

Electronic Sound Recording Operator:   Madelyn Bedard

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ 08234-5901**
**1-609-927-0299    FAX 1-609-927-9768    1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 2 Cover
#08-40749
6-2-2008

**APPEARANCES**

For the Debtors:                          MARK E. FREEDLANDER, ESQ.
                                          McGuire Woods, LLP
                                          625 Liberty Ave.   23rd Fl.
                                          Pittsburgh, PA  15222

                                          DOUGLAS R. GOODING, ESQ.
                                          Choate, Hall & Stewart
                                          Two International Place
                                          Boston, MA  02110

Special Patent Counsel to the Debtor:     MICHAEL A. ALBERT, ESQ.
                                          Wolf, Greenfield & Sacks, P.C.
                                          600 Atlantic Avenue
                                          Boston, MA  02210

For Official Committee of Unsecured       DOUGLAS B. ROSNER, ESQ.
Creditors:                                Goulston & Storrs, Esq.
                                          400 Atlantic Avenue
                                          Boston, MA  02110

For Luis Navarro:                         GORDON Z. NOVOD, ESQ.
                                          Kramer Levin Naftalis and Frankel, LLP
                                          1177 Avenue of the Americas
                                          New York, NY   10036

For AngioDynamics, Inc.:                  JOSEPH  ZAGRANICZNY, ESQ.
                                          Bond, Schoeneck & King, PLLC
                                          One Lincoln Center
                                          Syracuse, NY  13202
                                                  ------continued--------


Electronic Sound Recording Operator:    Madelyn Bedard

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299       FAX 1-609-927-9768       1-800-471-0299**
**e-mail - irwingloria@comcast.net**

Page 3 Cover
#08-40749
6-2-2008

APPEARANCES:

For Deirdre Maher, creditor:

DEIRDRE MAHER, *Pro se via telephone*
918 Eolus Avenue
Encinitas, CA  92024

For Endolaser Associates, LLC and its
Managing Member, Luis Navarro, M.D.:

CHARLES A. DALE, III, ESQ.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP
State Street Financial Center
One Lincoln Street
Boston, MA  02111

For Subordinated Secured Creditors:

DAVID W. BADDLEY, ESQ.
Greenberg Traurig, LLP
77 West Wacker Drive,  Suite 2500
Chicago, IL  60601

ANNAPOORNI SANKARAN, ESQ.
Greenberg Traurig, LLP
One International Place   20th Fl.
Boston, MA  02110

Electronic Sound Recording Operator:    Madelyn Bedard

Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service

GCI TRANSCRIPTION SERVICES
**210 Bayberry Avenue**
**Egg Harbor Township, NJ  08234-5901**
**1-609-927-0299      FAX 1-609-927-9768      1-800-471-0299**
**e-mail - irwingloria@comcast.net**

1 (At 1:18:00 p.m.)

2          MS. MAGEROWSKI:  Please be seated.  Diomed,

3 Incorporated.  Case #08-40749.  Would the parties please

4 identify themselves for the record, starting with the party on

5 the line.

6          MS. MAHER:   Yes.  Deirdre Maher.

7          THE COURT:   Thank you.  In the courtroom, Mr.

8 Rosner.

9          MR. ROSNER:   Douglas Rosner for the Creditors'

10 Committee, Your Honor.

11          MR. DALE:  Good afternoon, Your Honor.  Charles Dale

12 for Endolaser Associates, LLC.  With me my co-counsel Mr.

13 Novod.

14          MR. NOVOD:  Yes, Your Honor.  For the record, Gordon

15 Novod of the law firm of Kramer, Levin, Naftalis & Frankel

16 appearing with my co-counsel on behalf of Endolaser.

17          MR. ZAGRANICZNY:  Good afternoon, Your Honor.  Joseph

18 Zagraniczny:  Bond, Schoeneck & King, attorneys for

19 AngioDynamics, Inc.

20          MR. FREEDLANDER:   Your Honor, good afternoon.  I am

21 Mark Freedlander of McGuire Woods.  With me to my right is Doug

22 Gooding of the Choate firm.  We are co-counsel to the debtors.

23 Also with me, between myself and Mr. Gooding, is Mr. Michael

24 Albert of the Wolf Greenfield firm.  If you may recall, Your

25 Honor, Wolf Greenfield was retained as special patent counsel

1  to the debtor.

2          MR. BADDLEY:  Good afternoon, Your Honor.  David

3  Baddley and Anna Sankaran from Greenberg Traurig on behalf of

4  the subordinated secured creditors.

5          THE COURT:  Didn't you ask for permission to appear

6  by phone?

7          MR. BADDLEY:  Yes, I did, Your Honor, and --

8          THE COURT:  Okay.  You know it was allowed.

9          MR. BADDLEY:  What's that?

10          THE COURT:  You know it was allowed.

11          MR. BADDLEY:  Yes.

12          THE COURT:  Oh, okay.

13          MR. BADDLEY:  Thank you.

14          THE COURT:  Okay.  Okay, today is the 2nd.  All

15  right, are we ready to proceed, Mr. Freedlander?

16          MR. FREEDLANDER:  I am, Your Honor.  Your Honor, as

17  requested by the Court at the last hearing that we held

18  regarding the proposed sale, the parties have conferred and

19  exchanged counter-proposals but were not able to reach terms

20  and conditions of a consensual arrangement.  In response to

21  that, Your Honor, the debtors and Angio have determined to

22  undertake an alternative approach, and that alternative

23  approach, Your Honor, has resulted in the filing of papers last

24  evening. So --

25          THE COURT:  Barely last evening.

1          MR. FREEDLANDER:   That is correct, yes.  Barely last

2   evening.  First there was a package of documents filed, as the

3   Court requested, which were the forms of the agreement as

4   amended, schedules and exhibits to the underlying asset

5   purchase agreement.  That package of documents, Your Honor, did

6   not include the proposed amendment to Section 3.2(k).  The

7   proposed amendment to Section 3.2(k) was independently filed of

8   record as well.

9          Likewise, Your Honor, a motion to expedited hearing

10  on the proposed rejection of the Endolaser license was filed,

11  and a corresponding motion to reject was filed as well.  So

12  that was the flurry of documents that were filed barely last

13  evening.

14         Now, Your Honor, as the documents illustrate, buyer

15  and seller have agreed that it is appropriate to reject the

16  underlying license agreement subject to the objection by

17  Endolaser.  The timing of that rejection is something that the

18  Court may very well need to determine because there are some

19  issues that I will describe.

20         Likewise, Your Honor, we've modified Section 3.2(k)

21  to address concerns expressed by the Court as well as by

22  Endolaser, Your Honor. And as I -- the intention of the

23  language -- and I believe it says -- is that -- and I'll take a

24  step back.

25         You'll recall, Your Honor, that the estate has the

1  exclusive right as to what's been referred to commonly as the

2  7-7-7 technology through two different pieces.  And I won't do

3  this quite as eloquently as I would expect an IP lawyer to do

4  it, but I'll do my very best to set the stage; and I'm certain

5  if I misstate, someone will jump up and down and make certain

6  the Court's aware that I so misstate.

7        But the -- Diomed acquired what amounts to an

8  ownership interest in the 7-7-7 technology from one of the I

9  believe five inventors, Dr. Min.  And in a -- it acquired it,

10  there are documents that speak to a purchase, and there was

11  financial consideration paid at the time of closing on the

12  purchase of these rights, and likewise there is a deferred

13  payment due under the documents as well.

14        THE COURT:  Deferred payment of the purchase price?

15        MR. FREEDLANDER:  That's really what it amounts to,

16  Your Honor, and it's measured in terms of sales of product.

17  But unlike the arrangement with Endolaser where you clearly

18  have a license, I think all the parties are in agreement as to

19  what the estate's rights are by way of the Min piece; and

20  again, that is an absolute undivided interest purchase.

21        THE COURT:  Well, let me -- this is the first I've

22  heard --

23        MR. FREEDLANDER:  Yes.

24        THE COURT:  -- that there was money still owed to

25  Mr. or Dr.  -- or, excuse me --

1          MR. FREEDLANDER:   Mmhmm.

2          THE COURT:   -- Min.

3          MR. FREEDLANDER:   Yes.

4          THE COURT:   Is he on the notice list?

5          MR. FREEDLANDER:   Oh, without question.

6          THE COURT:   Okay.

7          MR. FREEDLANDER:   He also sits on the Creditors'

8   Committee.

9          THE COURT:   Okay.  All right.

10          MR. FREEDLANDER:   Yes.

11          THE COURT:   Okay.

12          MR. FREEDLANDER:   And, Your Honor, I'll -- well, let

13   me move forward and then backwards, and sideways probably, too.

14          THE COURT:   Go ahead.

15          MR. FREEDLANDER:   But nevertheless, Your Honor, so

16   we have this piece, and there is an undivided ownership

17   interest in it, and likewise, there is a license from

18   Endolaser, a true license for the use of this technology.  And

19   this split --

20          THE COURT:   Now that's a license to use the -- given

21   by Endolaser to Diomed, which, when you combine it with the Min

22   piece, gives you 100 per cent of the ownership interest for

23   purposes of granting licenses and sublicenses, correct?

24          MR. FREEDLANDER:   It ostensibly gives us what I

25   would refer to as the exclusive right to use the technology.

1          THE COURT:    They did not reserve a right to use or

2   license themselves.

3          MR. FREEDLANDER:    It is an exclusive license from

4   Endolaser.

5          THE COURT:    Okay. Okay.

6          MR. FREEDLANDER:    And as I understand the Endolaser

7   piece, it is likewise under the document, which I believe

8   Endolaser has filed of record with their prior objection.  It's

9   freely assignable and transferrable as well.  Now obviously,

10  because it is a license --

11         THE COURT:    When you say "its" -- what are you

12  referring to.

13         MR. FREEDLANDER:    "It," the Endolaser license --

14         THE COURT:    Okay.

15         MR. FREEDLANDER:    -- is freely transferrable and

16  assignable.  Now with Diomed subject to Chapter 11 bankruptcy

17  proceedings, there are obviously Section 365 rights and

18  implications as it relates to this license.  That does not hold

19  true with respect to the other piece, the Min piece, which is

20  again owned by the estate; and I don't think again that even

21  Endolaser standing here objecting to the transaction would

22  argue otherwise.

23         So those are the two pieces that comprise what we've

24  referred to again as the 7-7-7 technology.

25         Under the prior rendition of Section 3.2(k), Your

1  Honor, it was proposed that Diomed, the estates, would provide

2  -- they wouldn't sue in respect of both pieces.  They would

3  lift the injunction.  Everything referred to the combination of

4  these rights; and as a result of our not being able to reach

5  financial terms with Endolaser, and likewise Angio the proposed

6  buyer was not able to reach terms in respect of an ongoing

7  royalty payment that may otherwise be due to Endolaser.  So

8  there just wasn't a meeting of the minds in terms of how we're

9  going to deal with it.

10       The next best thing, as we understand it, would be

11  for the estate again, which has this undivided ownership

12  interest, to license the right to use this technology to the

13  buyer; and I don't think there is any dispute as to Diomed's

14  right to issue this type of license.

15       THE COURT:  Well, let me ask you that --

16       MR. FREEDLANDER:  Yes.

17       THE COURT:  -- question.  Absent the bankruptcy --

18       MR. FREEDLANDER:  Mmhmm.

19       THE COURT:  -- would you -- would Diomed have the

20  right to license the technology under just the Min piece,

21  independently of their arrangement with -- with Endolaser,

22  which gave you all of the rights, the exclusive right to

23  license.

24       MR. FREEDLANDER:  Yes.  It is -- I need to caveat,

25  because there remains one open dispute as it relates to what we

1  propose to do.  The amendment refers to world-wide rights; and

2  it has been suggested by Endolaser, again represented by good

3  counsel that can speak for themselves -- it has been suggested

4  to them that in respect of a world-wide license, in certain

5  countries you must have rights to the whole as opposed to the

6  part in order to provide this type of license.

7      And we have conferred with intellectual property

8  counsel, and I more or less understand that that's correct.  So

9  the only thing that Diomed could convey by way of a sublicense

10  is that which it has a right to under the Min piece.  And as I

11  understand it again, Your Honor, either inside or outside of

12  the bankruptcy protection, Diomed would have the ability to

13  license these Min rights to others.

14      THE COURT:  But that's what I'm trying to

15  understand.

16      MR. FREEDLANDER:  Yes.

17      THE COURT:  What the --

18      MR. FREEDLANDER:  Yes.

19      THE COURT:  -- relationship --

20      MR. FREEDLANDER:  Mmhmm.

21      THE COURT:  -- would be without bankruptcy.

22      MR. FREEDLANDER:  Yes, as I understand it again --

23  and I, again, to the extent that you have further questions, my

24  understanding of intellectual property law goes about as far as

25  what I'm explaining to the Court, and not much further --

1          THE COURT:   And mine goes less far, but I'm trying

2  to catch up.

3          MR. FREEDLANDER:   Yes.

4          THE COURT:   You undertook -- Diomed undertook to

5  license for the account of both, if you would, under this

6  license agreement, and they have -- you have certain

7  obligations to them if you license.  They get a piece of

8  action, if you will.  They get a royalty.

9          MR. FREEDLANDER:   Yes.

10         THE COURT:   But did that give you -- while you --

11  and you still are under that license agreement --

12         MR. FREEDLANDER:   Mmhmm.

13         THE COURT:   -- did that give you the right to

14  license somebody like Angio directly without use of the

15  license agreement and then cut them out of the -- their share

16  of the royalties?

17         MR. FREEDLANDER:   Well, remember, Your Honor, that

18  there are a couple of things to keep in mind.  And, Michael,

19  please, if I -- if I step over the line and I'm incorrect, I'll

20  ask him to please correct me of record.  But I understand, Your

21  Honor, that when you look at the Min piece alone, that piece

22  which is owned, the company absolutely positively could license

23  that piece exclusively, regardless of whether Diomed were

24  subject to bankruptcy proceedings.

25         THE COURT:   I understand that, but you -- but

1  there's also -- you undertook certain responsibilities to a

2  third party --

3           MR. FREEDLANDER:   Yes.

4           THE COURT:   -- when you became a party to the

5  license agreement.

6           MR. FREEDLANDER:   Mmhmm.

7           THE COURT:   And it would seem to me the license

8  agreement would have virtually no meaning if you had this

9  license agreement which was an exclusive, so they couldn't

10  license to anybody; and then you could -- if you could ignore

11  the license agreement and licensed just under the Min umbrella,

12  and then they get no royalties, because under Min they're

13  entitled -- of the Min piece, they're entitled to no royalties,

14  as I understand it.

15           MR. FREEDLANDER:   I am not of the impression, Your

16  Honor, that restrictions of the nature you speak of are

17  contained within the Endolaser license.

18           THE COURT:   Well, I -- what I'm asking is, are they

19  contained -- I mean, I don't -- is that Kosher, if you will,

20  under intellectual property jurisprudence?

21           MR. FREEDLANDER:   It has been explained to me --

22  because before we ever made the recommendation, we spoke about

23  what we could and could not do in -- under intellectual

24  property law, at length, with the company's intellectual

25  property counsel.  And it has been explained to us that what we

1 propose to do is indeed kosher, regardless of whether there is

2 the overlay of the Chapter 11 proceeding or not.

3          THE COURT:   You -- you're -- maybe --

4          MR. FREEDLANDER:   I --

5          THE COURT:   -- you're hearing the words, but you're

6 not responding to the question.

7          MR. FREEDLANDER:   I'm trying very hard.  I just --

8          THE COURT:   All right.

9          MR. FREEDLANDER:   -- somehow or --

10          THE COURT:   Forget the bankruptcy.

11          MR. FREEDLANDER:   Okay.

12          THE COURT:   You've got a  licensing agreement with

13 Endolaser that prevents them from licensing to anyone.

14          MR. FREEDLANDER:   It does.

15          THE COURT:   Is what you're telling me is you have

16 two avenues to license?  One, the -- by the collection of all

17 owners because you have a license agreement to the Min --

18          MR. FREEDLANDER:   Yes.

19          THE COURT:   -- so you'd -- in one situation you'd

20 license and they'd be entitled to a royalty --

21          MR. FREEDLANDER:   Mmhmm.

22          THE COURT:   -- or you have the  license agreement

23 which blocks them from licensing to somebody else, and you can

24 license just under your Min piece and disregard their right to

25 a royalty.  Is that what you're telling me the status would be

1 without the bankruptcy?

2          MR. FREEDLANDER:    That is my understanding.  Well,

3 Your Honor, I guess the point I would make to you is that when

4 you have this exclusive right, as I understand it there are

5 certain benefits to Diomed by virtue of having this, which

6 won't exist in the event of rejection.

7          So by way of example, as I understand it, no other

8 party would really have the ability to bring an enforcement

9 action unless they join the other piece as an indispensable

10 party.  So today, Diomed alone is the only party that could

11 bring --

12          THE COURT:    I understand that.  But I still don't

13 have an answer to my prior question, which -- and perhaps

14 counsel can --

15          MR. FREEDLANDER:    I'm going to stop because --

16          THE COURT:    -- enlighten me.

17          MR. FREEDLANDER:    -- I'm just --

18          THE COURT:    All right.  If he understands my

19 question.  You can come to the microphone.

20          MR. FREEDLANDER:    I would just --

21          THE COURT:    We'll let -- we'll let intellectual

22 property counsel speak.

23          MR. ALBERT:    Good afternoon, Your Honor.  Michael

24 Albert of Wolf Greenfield.

25          I believe, if I understood the Court's question, is

1  whether Diomed could license just  -- to a third party just

2  based on the Min rights without the Endolaser rights?

3          THE COURT:   Right.

4          MR. ALBERT:   The answer to Your Honor's question is

5  yes, it could.  In fact, the --

6          THE COURT:   So what protection does anybody have,

7  like an Endolaser --

8          MR. ALBERT:   Right.

9          THE COURT:   -- who entrusts the right to license to

10 a company like Diomed, trusting them -- because it almost seems

11 untoward that they could -- they take the license agreement but

12 they don't have to pay them a royalty.

13         MR. ALBERT:   Well, they do.  They -- they -- so at

14 the time -- they initially acquired -- Diomed initially

15 acquired the rights from Dr. Min.

16         THE COURT:   I understand.

17         MR. ALBERT:   And then subsequently from Endolaser.

18 Pursuant to the Endolaser agreement, my understanding is Diomed

19 does have an obligation to pay certain royalties to Endolaser.

20         Now I'll make the same caveats that Mr. Freedlander

21 made about not being an IP lawyer.  I'm not a bankruptcy

22 lawyer, so I can't speak to --

23         THE COURT:   This isn't a bankruptcy question.

24         MR. ALBERT:   -- so I can't speak to whether they

25 would have a proof of claim or what sort of claim they would

1  have.

2          THE COURT:   Not the question I'm asking.  The

3  question I'm asking is, if Diomed licensed it just by reason of

4  holding the Min piece --

5          MR. ALBERT:   Yes.

6          THE COURT:   -- would they be entitled to a royl --

7  would Endolaser be entitled to a royalty from Diomed?

8          MR. ALBERT:   The way the agreements were drafted

9  pre-bankruptcy or leaving that issue out, yes, they would.  So

10 any sale that Diomed made -- again, prior to the Chapter 11

11 filing, the way that the system was set up, Dr. Min had a right

12 to a certain royalty, and Endolaser had a right to a certain

13 royalty for every sale that Diomed made.

14         THE COURT:   Okay.  You've answered the question.

15 Thank you.

16         MR. ALBERT:   Oh, but they -- yeah.  Okay.

17         THE COURT:   All right, Mr. Freedlander, continue,

18 please.

19         MR. FREEDLANDER:   So again, Your Honor, having heard

20 -- and I hope we've adequately addressed the concern that you

21 have.  But having heard the arguments of Endolaser and not

22 being able to reach terms and conditions with them as to how

23 the estate could convey interest in the whole piece, either

24 through license or whatever the case may be, and hearing the

25 Court's concerns, the thing that seemed to make the most sense

1   to us was to reject the underlying Endolaser license as of a

2   date certain, which is to be discussed; and likewise, again,

3   licensing these rights that the estate, the ownership interest

4   in the Min piece to Angio as purchaser.

5           And with certain small revisions that will be

6   required, Your Honor, it's fair to say that I believe Angio is

7   satisfied that this meets their requirements; and we likewise

8   believe that in respect of 365(k), in respect of Section 365

9   under the Bankruptcy Code, Your Honor, we are giving Endolaser

10  everything that they have a right to under Section 365 and not

11  otherwise impairing the rights that they may have.

12          Now in terms of timing, Your Honor, we did file an

13  expedited motion, "we" being the debtors filed an exp --

14          THE COURT:   Well, I'm not sure I'm going to act on

15  it today, but I figured since everyone was going to be here you

16  might even stumble upon a resolution today, so I ought to have

17  it on the calendar anyway.

18          MR. FREEDLANDER:   Yeah.  I -- ruling or not ruling

19  I'm not certain is essential for today, but I think it must be

20  addressed in the context of what --

21          THE COURT:   I agree with you.

22          MR. FREEDLANDER:   -- we propose to do, Your Honor.

23  And the underlying issue that exists, so the Court has an

24  appreciation for where we are, Endolaser as I understand it --

25  and again, if I misspeak, I'm certain that they will correct

1    me.

2            THE COURT:   I'm certain they will, too.

3            MR. FREEDLANDER:   And I feel pretty confident of

4    that.  They would prefer that the license be rejected

5    immediately.  Now in order to satisfy the buyer, we believe it

6    important to retain the license for a short period of time; and

7    I'll explain to you why that is the case.

8            One of the conditions required by Angio is that the

9    injunction issued by the District Court in respect of the

10   underlying litigation brought by Diomed as against Angio pre-

11   bankruptcy, years before the bankruptcy was filed -- Angio

12   requires that that injunction be lifted.

13           It's really our belief, Your Honor, that is belt-and-

14   suspenders and not really necessary as a matter of intellectual

15   property law because Diomed has the free right, subject to

16   Bankruptcy Court approval, to license the Min rights; and that,

17   in and of itself, we believe would be sufficient, as a matter

18   of intellectual property law, to permit AngioDynamics as

19   proposed purchaser to enjoy the benefit of the 7-7-7

20   technology.  But Angio has conferred with its intellectual

21   property lawyer, and they have suggested that they are only

22   prepared to close in the event the Court were to approve the

23   transaction if this injunction is first lifted.

24           So in order to make things as neat as possible, in

25   the event the Court were to approve the underlying transaction,

1  we would immediately go into the District Court and seek

2  authorization to have this injunction lifted.  And in the

3  interim, we would expect that the estate would continue to have

4  its licensed rights to the Navarro or Endolaser technology, all

5  the while having the obligations that exist under that license

6  in the intervening period of time.

7          And it's my view, and my view alone, and I hope that

8  the Court would adopt a similar view, that in respect to 365

9  rights, this really is analogous to a going-out-of-business

10 sale where you have a landlord, where you proposed to utilize

11 the space you're going to reject by a date certain, but it's

12 premised upon your ability to continue to use the space while

13 you conduct a going-out-of-business sale.  And --

14          THE COURT:  Well, it's a little different because

15 when you're done using the space you give it back.  Here, when

16 you're done using a license, you're affecting -- what you're

17 suggesting is you want to affect their rights during this gap

18 period.

19          MR. FREEDLANDER:  I would suggest to you that that

20 really isn't the case, and here's why, Your Honor.  In the

21 underlying litigation, at the time the injunction was issued,

22 Diomed held both pieces again -- the only party that really

23 could have done what it did.  And at the time of rejection,

24 Endolaser will receive back exactly what it did -- exactly what

25 it licensed.

1          I'm of the impression, based on again conversations

2    with our intellectual property lawyers, that Endolaser doesn't

3    really have the ability to come back into the District Court

4    and somehow argue that the lifting of this injunction is

5    otherwise improper.  There's not a party with appropriate

6    standing, as it's been explained to me, to even attempt to do

7    that.

8          THE COURT:   Well, I -- I -- I would assume that's

9    one view of the possibility.

10         MR. FREEDLANDER:   Pardon me?

11         THE COURT:   I would expect we might hear a different

12   tune from that side of the room.

13         MR. FREEDLANDER:   You may or may not.  I just -- I--

14         THE COURT:   I don't know.

15         MR. FREEDLANDER:   Okay.  But again, that's at least

16   how we analogize things and believe that, again, in respect of

17   Section 365, unless there is cause shown, we really have until

18   a plan is confirmed to make a determination with respect to

19   assumption or rejection, but instead, we understand where we

20   are, and we seek to provide them that to which they're entitled

21   as soon as humanly possible.

22         So, Your Honor, as I understand it and see things,

23   unless again there's another party that believes otherwise, in

24   respect of the proposed sale, taking aside the bad faith issues

25   which obviously need to be addressed, and there were

1  supplemental papers filed by Endolaser, again suggesting that

2  there's bad faith, and I'd like another moment to address that,

3  in light of these supplemental papers, it appears as though the

4  two real issues in respect of what we now propose to do is,

5  number one, the amendment to Section 3.2(k) proposes this

6  world-wide license.  And all that these estates are really able

7  to provide is that which they have a right to.

8          So the only thing that we're able to provide in

9  respect of where we are with each of Endolaser and the Min

10 piece that the estate owns is again convey to them all the

11 rights that the company could provide with the piece that they

12 own and nothing more.  That's all we can do as to that piece.

13         And the other issue, Your Honor, is there's no doubt

14 provided that Angio is going to close, that it makes sense for

15 the estate to reject the Navarro license; but we need to be

16 comfortable that the estate isn't giving something up that it

17 may otherwise require for perhaps another potential purchaser

18 in the event that Angio, for one reason or another, does not

19 actually close on the transaction.

20         So we have this world-wide licensing issue, and

21 likewise the timing of proposed rejection, which I view as the

22 two open issues above and beyond good faith, Your Honor.

23         THE COURT:  So you -- would you acknowledge that the

24 covenant not to sue that you are proposing under your amended

25 3.2(k) is only on behalf of Diomed and is not binding on

1  Endolaser?  Are you --

2          MR. FREEDLANDER:   It would not be binding upon

3  Endolaser.

4          THE COURT:   And --

5          MR. FREEDLANDER:   That's not even the intention at

6  all.

7          THE COURT:   And everybody understands that.

8          MR. FREEDLANDER:   I believe that everyone does

9  understand that that --

10          THE COURT:   Okay.

11          MR. FREEDLANDER:   -- to be the case, Your Honor.

12          THE COURT:   Now let me ask you a question, since you

13  made mention the possibility of another buyer.

14          MR. FREEDLANDER:   Yes.

15          THE COURT:   And I'd like to hear from the Committee

16  on this as well.

17          MR. FREEDLANDER:   Mmhmm.

18          THE COURT:   This proposed change -- because everyone

19  was bidding against your agreement -- this proposed change, is

20  that material enough to require that we notice this change to

21  other potential bidders?

22          MR. FREEDLANDER:   We have actually discussed that

23  question, both internally and with the Committee, and the view

24  is -- and again, Mr. Albert can stand up and explain to the

25  Court if I'm wrong -- but my understanding again, Your Honor,

1  is that what we proposed to do in Section 3.2(k), which was

2  pending before the Court and was noticed to all the parties,

3  was a *de facto* license.  So now that we are actually going to

4  issue a license, in substantive terms my understanding is it

5  has the exact same effect.

6          Now understanding that, I don't believe, based on

7  what has been explained to me, that there really is a need to

8  re-notice at all.  Again, Mr. Min sits on the Committee, and

9  the Committee has been regularly apprised by coun --

10          THE COURT:   It wasn't Mr. Min that I was concerned

11  about.  He's not bidding.

12          MR. FREEDLANDER:   Yeah.

13          THE COURT:   It was other bidders.  I don't know --

14  because I -- and I don't care to know --

15          MR. FREEDLANDER:   Right.

16          THE COURT:   -- all the machinations of why people

17  bid or chose not to bid, and I don't know, and I don't know

18  whether the Committee has any sense whether this --

19          MR. FREEDLANDER:   Mmhmm.

20          THE COURT:   -- particular provision was a material

21  part of their decisions not to bid.

22          MR. FREEDLANDER:   Again, as I understand it, Your

23  Honor, what we are doing is very similar to that which we

24  proposed to do before; and if anything, it actually would be

25  worse, because before, we were involving both the owned piece

1  and the licensed piece; whereas now, we're only involving the

2  owned piece.

3          So I would suggest to the Court that given where we

4  were and where we are today, Angio is agreeing to less than to

5  what they had agreed to under the original asset purchase

6  agreement, notice to all the other parties, Your Honor.

7          THE COURT:   Let me ask you about the injunction.

8          MR. FREEDLANDER:   Okay.

9          THE COURT:   We've looked at the papers as best we

10  could today to understand.   The license -- the injunction was

11  obtained in the Court on the basis of an infringement.

12          MR. FREEDLANDER:   That is correct.

13          THE COURT:   Okay.   And there's no distinction in the

14  record that I can see -- maybe because it wasn't necessary for

15  the Court to determine -- that the Min piece was infringed on

16  or the Endolaser piece was infringed on; the patent was

17  infringed on.

18          MR. FREEDLANDER:   I believe that to be the case.

19  Yes.

20          THE COURT:   Okay.   I did not have time to research

21  the issue of whether that injunction, which was clearly for the

22  benefit of the patent holder.   Even though not every one of the

23  people who has an interest in that patent is named in the

24  injunction or in the lawsuit, in fact, do they -- other

25  interest holders in the patent have no rights under that

**Page 24**

1    injunction?

2          MR. FREEDLANDER:   As I understand it, Your Honor,

3    the answer is no.  But again, I --

4          THE COURT:   And does the person who represents those

5    rights, which in this case is Diomed, in that litigation --

6          MR. FREEDLANDER:   Yes.

7          THE COURT:   -- have no duty to the other owners of

8    the patent?

9          MR. FREEDLANDER:   Again, Your Honor, and I'll really

10   defer to Mr. Albert, but as I understand it, Your Honor,

11   holding the two pieces that the est -- that Diomed on a pre-

12   petition basis held and passes to the bankruptcy, there are not

13   third-party beneficiaries to the injunction.

14         MR. ALBERT:   Yeah.  I'd be happy to try to clarify

15   that point, and it was also pointed out to me that I should

16   clarify something from what I said earlier, if I could, Your

17   Honor.

18         On the first issue, a license is, in effect, a *de*

19   *facto* covenant not to sue.  There are cases that suggest that

20   the terms are effectively used interchangeably.  But the owner

21   of a patent or the owner of rights under a patent can license

22   those rights, even it only owns the rights from one of the

23   inventors.

24         So, in fact, there was a time when Diomed had

25   acquired Dr. Min's rights and had not yet acquired Endolaser's

1  rights, and even at that time Diomed could enter into a license

2  agreement with a third party.

3          THE COURT:   We're not talking about that.  We're

4  talking about a patent infringement lawsuit which was brought

5  on behalf of the patent, I guess, because they -- and they

6  weren't saying they were infringing on the Min piece --

7          MR. ALBERT:   Right.

8          THE COURT:   -- they weren't saying they were

9  infringing on the Endolaser piece.  They're saying -- they said

10 "Angio infringed upon this patent."

11         MR. ALBERT:   Yes, Your Honor.

12         THE COURT:   The Court agreed, damages were awarded,

13 and an injunction was entered.

14         MR. ALBERT:   Yes, and the sole party with standing

15 to do that was Diomed, Inc.

16         THE COURT:   Okay.  Because Diomed, Inc. had all of

17 the pieces of the puzzle, if you will -- all the ownership

18 pieces under its umbrella at the time.

19         MR. ALBERT:   Well, it didn't even need to have all

20 of them, Your Honor.  That's what I'm trying to get across.  It

21 only needed one piece in order to license someone, and it could

22 have brought the action that it brought -- well, to bring --

23 no, Your Honor, is right.  To bring the action, it did need all

24 the ownership pieces.

25         THE COURT:   Yeah, but you just told me or somebody

1 just told me you needed everybody who has a piece of the pie to

2 agree to bring the action.

3          MR. ALBERT:   To bring the action they needed all the

4 pieces of the pie.

5          THE COURT:   All right, so they had all the pieces.

6          MR. ALBERT:   Yes.

7          THE COURT:   They got -- they couldn't have brought

8 the infringement action either without Endolaser's piece.

9          MR. ALBERT:   Without owning it.  Yes, that's

10 correct.

11          THE COURT:   Owning or having a licensing agreement--

12          MR. ALBERT:   Having the rights to do it --

13          THE COURT:   -- which gave them the right to enforce

14 it.

15          MR. ALBERT:   Yes.

16          THE COURT:   Okay.  So they enforce it.  They got the

17 money judgment. It was paid.

18          MR. ALBERT:   Yes.

19          THE COURT:   Or a compromised amount was paid.

20          MR. ALBERT:   Yes.

21          THE COURT:   Now there's an injunction, and does --

22 where does Endolaser get the right to surrender the protection

23 of the injunction from a piece of the patent?

24          MR. ALBERT:   Well, I believe the answer to that,

25 Your Honor, is that they never had the protection of the

1  injunction.  The only party that had that injunctive right was

2  Diomed, Inc., which is the only party that's a plaintiff or

3  that was named as a plaintiff in the lawsuit.

4        THE COURT:  But it would not have been proper, as

5  you've explained it to me, for any other party to be named as

6  the -- I mean, this is the way litigation is always brought, by

7  one party --

8        MR. ALBERT:  No, Your Honor --

9        THE COURT:  No?

10        MR. ALBERT:  -- there are numerous instances in

11  which multiple owners of a patent will come together and be

12  joined as parties.

13        THE COURT:  What I'm concerned about is it would

14  seem to me that them giving away this protection of the

15  injunction -- and presumably it's only for the period of --

16  from the date of the -- and issuance of the injunction until

17  they become a licensee.

18        MR. ALBERT:  Well, they had already given up their

19  right to seek an injunction.  They had given those rights to

20  Diomed in exchange for a right to a royalty payment.  Whether

21  Diomed -- whether they -- Diomed or the estate of Diomed owes

22  them a royalty payment is not an issue I can address.

23        THE COURT:  Yeah, but now retroactively Diomed's

24  giving up rights that already presumably exist, because the

25  minute there's a license to Angio you don't need the injunction

1    anymore.

2            MR. ALBERT:    Right, Your Honor.

3            THE COURT:    The injunction protects them from

4    nothing because they now have the right to use it.

5            MR. ALBERT:    That's correct.

6            THE COURT:    So it's from the maximum amount of

7    duration we're talking about the injunction protects is either

8    -- was from the date of the injunction until the day of

9    license.

10           MR. ALBERT:    Right.  What the injunction gave Diomed

11   was the power to keep Angio out of that market during that time

12   period.  Diomed retained, under the agreement that it had with

13   Endolaser, the right to make a determination as to how to

14   proceed with the lawsuit, whether to proceed with it, whether

15   to seek an injunction, whether to give up the injunction,

16   that's all vested in Diomed, Inc. as the sole plaintiff in the

17   lawsuit.  All Endolaser retained is a contractual right to

18   obtain certain royalty payments.

19           THE COURT:    Yeah, but what's troublesome, and maybe

20   I'm the only one in the room troubled by it, is they're now

21   getting paid to give up the injunction when it in fact benefits

22   theoretically the Endolaser piece of the pie as well as the

23   Diomed piece; and Endolaser's not being asked and not getting

24   anything for it.

25           MR. ALBERT:    Well --

1          THE COURT:   And to me that reeks of breach of fidu -

2   -- potential breach of fiduciary duty.  And I'm saying that

3   because I'm applying concepts other than intellectual property

4   concepts.

5          MR. ALBERT:   Yeah, I was going to say that's way

6   outside my area of expertise.  I can't speak to what goes on in

7   the bankruptcy proceeding.  I can simply try to clarify --

8          THE COURT:   But that's not a bankruptcy concept.

9          MR. ALBERT:   -- who owns what rights.

10         THE COURT:   You'll have your chance, sir.

11         MR. ALBERT:   If there's anything else I can clarify

12  with regard to the ownership of the rights, I'd be happy to do

13  that.

14         THE COURT:   No, I understand.  I understand.  Thank

15  you.

16         MR. ALBERT:   Thank you.

17         MS. SANKARAN:  Your Honor --

18         THE COURT:   Angio was very anxious to be heard.

19         MR. ZAGRANICZNY:   Your Honor, I just wanted to point

20  out one thing.  Under the grant of a license between Endolaser

21  and Diomed, under paragraph 4, it identified that,

22             "Diomed shall be solely responsible for the

23             prosecution, foreign filing, and maintenance of

24             patent in the license territory."

25  And I believe that language allowed Diomed in its own name to

1  commence the lawsuit on behalf of both.

2          THE COURT:   I'm not questioning that.

3          MR. ZAGRANICZNY:   Oh, okay.  I'm --

4          THE COURT:   They won.

5          MR. ZAGRANICZNY:   Oh --

6          THE COURT:   That's the good news, from their

7  perspective.

8          MR. ZAGRANICZNY:   Correct, Your Honor.

9          THE COURT:   They won.

10          MR. ZAGRANICZNY:   Correct.

11          THE COURT:   Now they're trading their win for

12  something else, potentially to the detriment of Endolaser, and

13  I'm trying to understand whether they really have the right to

14  do that.

15          MR. ZAGRANICZNY:   Okay.

16          THE COURT:   Can you add anything to that?

17          MR. ZAGRANICZNY:   Well, but --

18          THE COURT:   I mean, I know you believe they can, but

19  can you help me beyond that?

20          MR. ZAGRANICZNY:   Well, I want a safeguard from the

21  buyer's point of view, Your Honor.  I believe they can only --

22  at this present time I think they can because the -- the grant

23  of the license also uses language that "if licensee chooses to

24  enforce a patent."  Right now today --

25          THE COURT:   But they chose to.

1        MR. ZAGRANICZNY:   They chose to, Yes, Your Honor.

2  But I think, because they're the sole plaintiff, I would argue,

3  and I'm sure that Endolaser may disagree, but I would argue

4  that they -- right now, not at the time necessarily when they

5  give up the Endolaser piece, the exclusive license, but right

6  now I believe they do; that's why, Your Honor, I had --

7        THE COURT:   I understand why the timing of the

8  rejection --

9        MR. ZAGRANICZNY:   -- is important.

10        THE COURT:   -- is important.

11        MR. ZAGRANICZNY:   I apologize for --

12        THE COURT:   Oh, that -- don't apologize.  Important

13  stuff.  Go ahead, Mr. Freedlander.

14        MR. FREEDLANDER:   Your Honor, I -- again, I

15  understand where you're stuck.

16        THE COURT:   And I'm going to -- I don't want to wait

17  too much longer before I give Endolaser a chance to --

18        MR. FREEDLANDER:   That's fine.

19        THE COURT:   It's like they're not even here, so far.

20        MR. FREEDLANDER:   No, they -- they're sitting

21  silently in wait.

22        THE COURT:   Patiently.

23        MR. FREEDLANDER:   I understand.  But the piece that

24  concerns you, Your Honor, it seems to me that Endolaser made a

25  decision to subject itself to those types of things when the

1  patent -- the owners, for whatever reason may have occurred in

2  the past, one piece of ownership of this technology decided to

3  sell, and another piece didn't, and instead they retained

4  rights and they licensed.

5          And because you had -- for lack of a better term --

6  this severance of interest, there was always the possibility

7  that a company could file for bankruptcy protection and be

8  subject to -- the two pieces are subject to very different

9  rights as a result.

10          THE COURT:   Yeah, but you've got to recognize, Mr.

11  Freedland --

12          MR. FREEDLANDER:   Yes.

13          THE COURT:   -- that this is a highly, highly unusual

14  situation we have here, where an infringer of a patent -- a --

15  which there's already been a determination that they infringed.

16          MR. FREEDLANDER:   Yes.

17          THE COURT:   They've already paid --

18          MR. FREEDLANDER:   Mmhmm.

19          THE COURT:   -- nine million dollars.  There's

20  already a permanent injunction, now they come along and they

21  want to buy the interest.  And you're not saying that -- you're

22  not -- you wouldn't argue to me that waiver of this injunction

23  is the best interest of Endolaser.  It may be in the best

24  interest of Diomed and its estate; but you're now acting on --

25  you're affecting their rights dramatically with no compensation

1    to them on something that -- that you -- Endo -- that Diomed

2    had already determined long ago that they were going to pursue.

3    And that's where I'm stuck, if you will.

4         MR. FREEDLANDER:   I don't believe, Your Honor, that

5    in respect of a debtor party to a contract and a non-debtor

6    party to a contract that the debtor party owes rights above and

7    beyond that which the underlying contract provides for.  That's

8    why -- that's where I think I have a disconnect with the Court.

9         THE COURT:   But, you see, you want -- you want it

10   both ways.  You want to use 365 as a weapon --

11        MR. FREEDLANDER:   Mmhmm.

12        THE COURT:   -- to -- if I said, "Great, I'll give

13   you the right to reject it right now," that's not good enough.

14        MR. FREEDLANDER:   But, Your Honor, again, that's by

15   no means a weapon.  It's actually -- I think your issue is with

16   Congress, not with what we propose to do.

17        THE COURT:   Gee, I'm -- that's usually my line.

18        MR. FREEDLANDER:   Yeah, I know it is.  It really is

19   the case.  I mean, I -- luckily, you know, you know what 365

20   case says -- I don't think -- I mean, 365 says.  I don't think

21   we have to go back and forth in terms of what the rights of the

22   estate are under 365.  Unless and until there is a

23   determination of cause shown by the Bankruptcy Court, the

24   estate would really have until again the time of confirmation

25   to make this determination.  There has been an objection.  We

1  are seeking to address the objection in the best way we

2  understand, but I don't believe at all that we are doing

3  anything outside of our Congress-given rights under Section

4  365.

5          THE COURT:   All right, let me hear from the other

6  side.

7          MR. FREEDLANDER:   Very well.  Thank you, Your Honor.

8          THE COURT:   Maybe we can narrow this down.

9          MR. FREEDLANDER:   And, Your Honor, if I could,

10 please, I still would like to address the good faith concept

11 when --

12         THE COURT:   Oh, if we get that far, absolutely.

13         MR. FREEDLANDER:    Thank you, Your Honor.

14         THE COURT:   Since we still have a participant on the

15 phone, please continue to identify yourselves for the record.

16         MS. MAHER:   Yes, my name is Deirdre Maher.

17         THE COURT:    No, no.  I just wanted to make sure

18 other people identify themselves, Ms. Maher, so you knew who

19 was speaking.  Go ahead, counsel.

20         MR. NOVOD:   Good morning -- or I should say good

21 afternoon, Your Honor.  Gordon Novod of the law firm of Kramer

22 Levin Naftalis & Frankel, speaking on behalf of Endolaser,

23 joined with my co-counsel, and again in the courtroom, Dr.

24 Navarro, the managing member of Endolaser sitting in the front

25 row.

 1          May it please the Court, one issue before the Court

 2   that's been raised is this new 3.2(k), and as the Court is

 3   certainly aware, we've had now several hours to review this

 4   agreement or modification to the asset purchase agreement, and

 5   one of the things which we have an issue with is the, quote,

 6   "world-wide," end quote, word being used in the context of

 7   3.2(k).  As the debtor has appeared to concede to this Court,

 8   Diomed really only has what it has to own, or what it owns, and

 9   it can't give anything more than it can actually give; and one

10   of the things which we've been able to at least confirm with my

11   own intellectual property counsel is that Diomed cannot agree

12   to give a license to Angio in the U.K., in Germany, in Canada,

13   without our consent; and also I think in Belgium as well.

14          THE COURT:  So obviously that would have to be

15   modified, or the order would modify it --

16          MR. NOVOD:  Yes, Your Honor.

17          THE COURT:  -- to limit that, but that's not an

18   issue.

19          MR. NOVOD:  That's --

20          THE COURT:  They understand that.

21          MR. NOVOD:  Right.  Of course.  And just to be

22   clear, that's one thing which we had asked them just

23   immediately prior to the hearing that it be taken care of.

24          There are a handful of other issues which we have.

25   The first is, if the debtor is going to be allowed to reject

1  our contract, we would ask that the Endolaser license agreement

2  be rejected immediately prior to the sale taking place, such

3  that in no way could the sale affect our rights.  And we would

4  actually ask also for a reservation of rights globally, saying

5  that, you know, nothing contained in the sale agreement or

6  otherwise will affect any of the rights we have under both

7  applicable bankruptcy and non-bankruptcy law.  And the reason

8  for that timing issue is the very thing that Angio is asking

9  for and which Your Honor has pointed the debtors' attention to,

10  which is the question of the permanent injunction.

11        In our view, the permanent injunction is what it is.

12  At the time of the proceeding, Diomed was acting on our behalf

13  pursuant to a license agreement.  When we entered into the

14  license agreement we received a lump sum of cash plus a few

15  cash payments over time; and we gave Diomed the ability to

16  litigate.

17        At the same time, Diomed agreed to use their

18  commercially reasonable efforts to enforce the patent.  That's

19  in our license agreement, which, for Your Honor's benefit, was

20  publicly filed with the SEC, and is not subject to any

21  confidentiality provisions.  And if Your Honor may or may not

22  have it in front of you is attached to our papers that we filed

23  a week and a half ago; but that's Section 3.1, it's a general

24  diligence provision, which goes to actually the debtor's

25  argument on whether and to what extent and what time would be

1  appropriate to reject our contract.

2          There are a number of issues with our contract that

3  if an Angio sale were consummated would compel immediate

4  rejection; those being that the debtor would no longer be able

5  to provide for continuing performance under the agreement as

6  far as selling products that use the 7-7-7.  And in addition to

7  that, Diomed would no longer be able to even assign the

8  contract to any interested party for -- although generally

9  speaking the Bankruptcy Code prohibits assign -- you know,

10 anti-assignment clauses, here we're in the world of patents as

11 well; and under non- bankruptcy law, an owner of a patent who

12 chooses to license it, license the technology to a company, has

13 the ability to have a say-so as to where that technology ends

14 up.

15         So we would stand before this Court and say that, you

16 know, in connection with the sale of substantially all the

17 assets, where Diomed would not be able to continue performing

18 under the contract, that there is no other choice but to reject

19 the contract.  That being said, Your Honor did spend a fair

20 amount of time asking about the permanent injunction.  And I'd

21 like to point two things out for the record:

22         First off, if I could turn the Court's attention to

23 3.2(k), the new version.

24         THE COURT:   New?

25         MR. NOVOD:   The new version, Your Honor.

1          THE COURT:    Yep.

2          MR. NOVOD:    If you look at the fourth line up from

3    the bottom, it talks really about the third part.  You know,

4    we've already covered the "world-wide" issue, but the third

5    part of 3.2(k) is with respect to the permanent injunction.

6    All Angio has agreed to and Diomed has asked for is sellers

7    agreeing to cooperate in all actions deemed reasonably

8    necessary by buyer to promptly vacate with respect to -- then

9    it goes on, you know, anything with respect to litigation in

10   District Court.

11          That being said, there's no contemplation that that

12   would happen prior to the Endolaser contract being rejected.

13   That's simply the document is the other way around.  This is

14   something which is a post-closing, post-sale obligation --

15          THE COURT:    Well, I could understand why --

16          MR. NOVOD:    Sure.

17          THE COURT:    I mean, I think you can, too.

18          MR. NOVOD:    Of course.  I would stand here and be--

19          THE COURT:    You don't want to give it up and then

20   the deal blows up.

21          MR. NOVOD:    Of course.  I'd be offended if Diomed

22   actually gave it away before the sale closed, and I think this

23   Court would as well.  That being said, though, there's no

24   reason why, as a condition to closing, any of the parties need

25   to go into the District Court and ask for the permanent

1 injunction to be lifted, because Angio didn't even agree to

2 that.  They agreed to something else, and --

3          THE COURT:  Well, I would assume they *wouldn't* go

4 in.

5          MR. NOVOD:  Of course.

6          THE COURT:  They have an agreement to go in after

7 the sale.

8          MR. NOVOD:  That's what I would presume as well.

9 That being said, if it were appropriate to go into the District

10 Court, we as the beneficial owners, should have the right to be

11 there in District Court as well.

12          THE COURT:  Well, that's up to the District Court,

13 and that's --

14          MR. NOVOD:  Of course.

15          THE COURT:  -- fortunately not something I have to

16 decide.

17          MR. NOVOD:  Unless, of course, we wanted to appear,

18 Your Honor, and felt the need to come to this Court for the

19 stay to be modified in one way to allow us to appear, whether

20 it be added as a beneficial -- essentially a third-party plain

21 -- or as a plaintiff to the suit, because at the end of the day

22 we are the party with a nominal -- a real monetary interest in

23 that litigation; and although we gave Diomed --

24          THE COURT:  I'm probably going go be told, Mr.

25 Novod, that if that happened and you were allowed in as a

1 plaintiff and the mod -- the injunction was modified to cover

2 you, the deal would blow up.

3          MR. NOVOD:   That might be true, Your Honor.

4          THE COURT:   That's usually what I'm told.

5          MR. NOVOD:   I would expect --

6          THE COURT:   I mean, in that kind of situation.

7          MR. NOVOD:   I would probably expect the same from

8 counsel to Angio.  That being said, Your Honor, our rights are

9 what our rights are.  We -- the litigation was brought on our

10 behalf, and we have a right, as Your Honor is aware, to claims

11 for the proceeds of that litigation.  And that involves -- and

12 we reserve all rights, and one thing which we would look for as

13 part of any Angio sale would be a reservation of rights to seek

14 the Court's allowance of an administrative expense claim, not

15 just for our post-petition royalties, but also for any amounts

16 which were received by the debtor post-petition with respect to

17 the settlement of the Angio and VSI claims.

18          So, you know, there are a handful of things which,

19 all things being considered, we would like to see tweaked if

20 this Court were to allow this to happen.  You know, the parties

21 engaged in a meaningful discussion where term sheets were

22 exchanged, and the parties were not able to, you know, reach an

23 agreement as far as the terms in which Angio would essentially

24 assume our license agreement.

25          That said, at the end of the day if all we have left

1  is, after rejection, is our  license agreement, Endolaser will

2  certainly speak to other parties and will be out in the market

3  marketing this.  And Angio will not have acquired, and nothing

4  in this sale should allow Angio to require -- to acquire --

5  excuse me, Your Honor -- anything other than simply what they

6  tell the Court today they're looking for, which is a non-

7  exclusive license of all that Diomed can give in the U.S.

8           THE COURT:   Well, but they're looking for more.

9  They're looking for an insurance policy from the time of the --

10 I'm not sure of what the earlier date is --

11          MR. NOVOD:   Mmhmm.

12          THE COURT:   -- but at least from the injunction --

13          MR. NOVOD:   Right.

14          THE COURT:   -- until closing.

15          MR. NOVOD:   Right.  And that's indeed, Your Honor,

16 in our first papers.  We actually said that we weren't aware of

17 any infringing activity that they're actually conducting.

18          THE COURT:   But what they're worried about is that

19 work around being an infringement.

20          MR. NOVOD:   Well, Your Honor, I can't --

21          THE COURT:   You know, we're talking frankly here

22 today.

23          MR. NOVOD:   Of course.  And I can't speak on behalf

24 of counsel to Diomed.  Diomed had spent twelve million dollars

25 over the five years before this case litigating IP litigation.

1  Now how much of that was allocated to Angio, how much of that

2  was allocated to the VSI litigation versus the VNUS litigation,

3  I have a sense of where those numbers are.  I don't know if

4  that's publicly available, so I'd rather not disclose it today.

5          THE COURT:   It's not available to me.

6          MR. NOVOD:   But --

7          THE COURT:   Or if it is, it's buried in something

8  that was filed this morning.

9          MR. NOVOD:   And that said, the estate has spent a

10  significant amount of money on this litigation, and that being

11  said, though, you know, the rights are what they are under the

12  contract.  And we would just ask that the Court, to the extent

13  that, you know, were to order anything on the license agreement

14  being rejected that it happen immediately prior to the sale

15  taking place, for we don't want anything under that sale

16  agreement to in any way infringe upon the rights it ended --

17  that we end up with.  And --

18          THE COURT:   Well, what would you propose to do?

19  Let's -- I mean, Angio's going to  -- wants to know.

20          MR. NOVOD:   Mmhmm.

21          THE COURT:   I'm hypothesizing now -- whether they're

22  going to have an injunction against them or not.

23          MR. NOVOD:   Right.

24          THE COURT:   And they're going to want to know that

25  before the sale.

1          MR. NOVOD:   Well --

2          THE COURT:   So somebody's got to go to the District

3  Court, and presumably it would be Diomed, and say, "Judge,

4  we're about to sell this, and the buyer, as part of the deal,

5  simultaneously with closing, the buyer wants a waiver of this

6  -- a waiver of the injunction."  And you're going to be there

7  with a motion to intervene or something, saying, "Judge, fine;

8  give it to them for Diomed, but not us.  We want the benefit of

9  the injunction."  The District Judge will say any number of

10  things:  "I don't want to talk about Diomed anymore.  All of

11  you, get out of here, there's an injunction.  It is what it is.

12  Good-bye."

13          MR. NOVOD:   Right.

14          THE COURT:   Or he's going to act on your motion and

15  either grant it or deny it, and --

16          MR. NOVOD:   I should add, Your Honor, that case is

17  actually -- as far as I know, it's -- there's no active

18  litigation in the case.  The judgment had been entered --

19          THE COURT:   Oh, the case is probably closed --

20          MR. NOVOD:   -- and it's probably closed by now.

21          THE COURT:   The District Court here --

22          MR. NOVOD:   Right.

23          THE COURT:   -- when they issue a judgment, they

24  close the case.

25          MR. NOVOD:   Right.  I can't say for sure as to

1  whether or not -- I know that they had posted a notice of

2  satisfaction and judgment on the docket in those cases, but I

3  can't represent to the Court that the case has been closed,

4  since we're not directly a party in the litigation.

5          THE COURT:  They administratively close them, but

6  that's an administrative --

7          MR. NOVOD:  With that said, Your Honor, you raise a

8  very interesting point.  What I would note to you is, let's

9  give Angio and Diomed what they bargained for and what they

10 agreed on in this settlement paper that they filed last night.

11 It's a forward-looking cooperation that takes place after

12 closing.  Because, remember, at closing, the way 3.2(k) works,

13 I mean, you've got to look back to the main agreement to see

14 this, it says,

15          "At closing buyer and seller agree to do the

16          following:"

17 -- and then it has,

18          " -- 3.2(k), an agreement in which the sellers agree

19          to cooperate in all actions."

20 That's forward-looking.  That's not (unclear)

21         THE COURT:  So what you're telling me is I qualify

22 the "world-wide," you're okay with this.

23         MR. NOVOD:  If you quali --

24         THE COURT:  You'll take your chances on what the

25 District Court does.

1        MR. NOVOD:   I think -- you know, the "world-wide" is

2   significant, and I don't think that -- you know, certainly

3   there are rights that we have under our license agreement that,

4   you know, quite honestly Diomed can't act without us, and I

5   think that they know that, and we certainly know that.  The

6   "world-wide" was an issue that was raised last night.  That

7   said, you know, what we're asking the Court is that you not

8   give them anything more than even what they asked for, other

9   than "world-wide."  You know, "world-wide" is something that

10  has to come out.

11        THE COURT:  Well, so let's say "world-wide" -- let's

12  say that comes out.  Are you telling me you're going to live

13  with the rest of (k)?

14        MR. NOVOD:   Well, I will tell you that they have

15  whatever rights they have; and if they're buying the

16  intellectual property and they think that, you know, I'm a

17  bankruptcy attorney by practice, but, you know, if they think

18  that they have the right and the ability under patent law to go

19  to the District Court and to say that, you know, although there

20  is a permanent injunction out there, we bought the rights for

21  part of that; and although we're not a party and maybe we have

22  and we are at risk, Diomed would say we are at risk for

23  Endolaser filing a claim against Diomed for some breach or some

24  other cause of action potentially out of that, you know, we

25  would have presumably all of our rights, and we would look for

1  nothing more from this Court other than a protection of our

2  rights.  And if that were to mean that I wanted to, you know,

3  ask this Court either today or in the future, you know, for

4  leave of the stay such that I could appear or my client could

5  appear in the District Court, that's what would be necessary.

6          THE COURT:  Well, of course, the order is full of

7  protections of the buyer --

8          MR. NOVOD:  Well --

9          THE COURT:  -- from, you know, the claims -- by

10 holders of claims or interests and whatever.

11         MR. NOVOD:  Yes.  We've drafted three or four, you

12 know, very brief riders which we think would address

13 Endolaser's concerns; and although we haven't shared them with

14 Diomed, Angio, or even, you know, any of the other parties in

15 the case, you know, given that we saw this at eleven o'clock

16 last night, we're -- it's a big of a work in progress, Your

17 Honor, and for that I apologize.

18         THE COURT:  All right, without -- without revealing

19 to me the term sheets that went back and forth --

20         MR. NOVOD:  Mmhmm.

21         THE COURT:  -- were you guys anywhere in the same

22 neighborhood?

23         MR. NOVOD:  We viewed the transaction, as Your Honor

24 is aware, as a -- the transaction as originally proposed, that

25 really just a license without our authority and without

1  compensation and the --

2         THE COURT:   I don't want -- I don't want the details

3  of the discussion.

4         MR. NOVOD:   To -- okay, to answer your question,

5  Your Honor, the answer is No.

6         THE COURT:   Okay.  That's fine.

7         MR. NOVOD:   We were looking for financial

8  compensation on a go-forward basis, as you would typically see

9  in an assumption and assignment of a contract, and that was not

10 something which was agreeable.

11        THE COURT:   Okay.  Anybody else want to be heard?

12 Mr. Rosner, you're sitting there very patiently and quietly

13 today.

14        MR. NOVOD:   Thank you, Your Honor.

15        THE COURT:   Thank you.

16        MR. ROSNER:    Your Honor, Douglas Rosner for the

17 Creditors' Committee.

18        At the last hearing we were before you to see whether

19 we could try to reach an agreement on amending 3.2(k) and try

20 to get some additional consideration for it.  We weren't

21 successful in doing that, and what -- having to -- under the

22 current circumstances, the Committee would support approval of

23 the sale, given that this is really right now, you know, to be

24 blunt, the only game in town.

25        With respect to the treatment of the 7-7-7 patent, we

1  looked at 3.2(k) or the new version of 3.2(k) as being

2  responsive to what the Court's concerns were at the last

3  hearing, because Diomed does own patent rights here, and Diomed

4  should be entitled to sell or license those patent rights in

5  its reasonable business judgment.

6         And in -- today's discussion has focused now on --

7  and was the focus at the last hearing as well, on well, what

8  the impact -- what is the impact on Endolaser as a licensor?

9  And there are a couple of comments I would like to make to

10 throw sort of some our thoughts into the mix here.

11        Section 365 is a critical material provision in the

12 Bankruptcy Code giving the debtors very important rights that

13 debtors depend on in order to reorganize or in order to

14 facilitate a sale to maximize value to the estate.

15        THE COURT:  But it wasn't in this case at the

16 beginning of this sale process.  It's only become so now.

17        MR. ROSNER:   It's become so because the buyer has

18 elected not to take the license, which the buyer has the right

19 to do.  The estate has elected not to assume and assign the

20 license because it wouldn't be in the best interest of the

21 estate, given the cure costs.  And although that's all

22 perfectly legitimate --

23        THE COURT:  Yeah, it is.

24        MR. ROSNER:    -- because the debtor has that right

25 to make those elections and reasonable business judgments.  So

1  that's fine.  So then the question is, well, is the non-debtor

2  party harmed by this?  And there's -- there is the old adage

3  that a non-debtor party doesn't get any better rights in

4  bankruptcy than it had outside of bankruptcy.  So to start

5  there -- and that's where the Court started today -- what

6  rights to Endolaser have outside of bankruptcy under their

7  license agreement?  What rights they had -- and these

8  provisions have been pointed out to the Court sort of

9  haphazardly -- Section 3.1 says,

10         "Licensee shall use commercially reasonable efforts

11             to more actively market and sell licensed products."

12  It doesn't say "commercially reasonable efforts to enforce the

13  patent."  It doesn't say, "Shall -- ."

14         THE COURT:    But see, that's -- that barn door was

15  opened and resolved a long time ago.  They did enforce the

16  patent.

17         MR. ROSNER:    No, and I --

18         THE COURT:    There's no question about it.  They

19  enforced -- and they enforced it successfully.

20         MR. ROSNER:    And -- yes, correct.

21         "And the licensee shall have the sole right to

22             enforce the patents."

23  And then 4.6(c) says,

24         "If licensee chooses to enforce," --

25  So I think the language of the license is giving the discretion

1  to the licensee --

2          THE COURT:   And they exercised it.

3          MR. ROSNER:    -- and they exercised it, so now --

4          THE COURT:   But now they want to undo that for their

5  benefit and potentially to the detriment of the other

6  contracting party.

7          MR. ROSNER:  So let's fast-forward in a hypothetical,

8  outside of bankruptcy Diomed sues Angio for infringement and

9  obtains a judgment against Angio, including an injunction --

10 okay?  All outside of bankruptcy.  And outside of bankruptcy

11 Diomed and Angio start discussing -- Angio appeals -- I mean,

12 some of this actually happened.  Angio appeals --

13         THE COURT:   So far all of it happened.

14         MR. ROSNER:   So Angio and Diomed then get going --

15 have discussions about settlement.  And let's just say they

16 decide to settle in the following manner: then Angio pays

17 Diomed a certain sum, and Diomed gives Angio a royalty-free

18 license.

19         THE COURT:   But that's not what happened.

20         MR. ROSNER:   No, but that's perfectly legitimate,

21 though.

22         THE COURT:   But that's not what happened.

23         MR. ROSNER:   But why is -- but I guess I keep

24 asking myself what's different here?

25         THE COURT:   Because they settled it without that,

1 and now they want to use their 365 rights.  They've got a

2 permanent injunction and they got the cash.  That's what they

3 won, and they got both.  And they got both for the benefit of

4 themselves and their licensor.  And now what they want to do is

5 they want to throw the licensor under the bus on the injunction

6 piece to -- to the -- for their own benefit to make the rest of

7 the deal happen.

8          MR. ROSNER:  So let's --

9          THE COURT:  And where do they get the right to do

10 that?  By inference, because they had the right to exercise

11 their judgment in another way, which they chose not to do; and

12 you're suggesting to me that that is a commerciable --

13 reasonably -- commercial and reasonable decision to throw them

14 under the bus for their benefit.

15          MR. ROSNER:   The license is really assignable.  So

16 again, if we were outside of bank --

17          THE COURT:  But they don't want -- but then let them

18 assign it!

19          MR. ROSNER:   Okay.  But if we were outside of

20 Bankruptcy Court --

21          THE COURT:  Then they --

22          MR. ROSNER:   Okay.

23          THE COURT:  -- could do the same;  They could assign

24 it or not.

25          MR. ROSNER:   Or --

1            THE COURT:    The problem is, could they reject it?

2  And they can't.

3            MR. ROSNER:    They couldn't reject it, but let's just

4  say that they did, in fact,  -- let's just say they did, in

5  fact, stop paying the royalties or something like that. Okay?

6            THE COURT:    Then they'd get sued.

7            MR. ROSNER:    But -- they'd get sued, but before the

8  license is ever terminated, they can reach a deal with Angio

9  and sell the company to Angio, but not the license.

10           THE COURT:    Yeah.

11           MR. ROSNER:     Right?

12           THE COURT:    But Angio -- what's Angio got?

13           MR. ROSNER:     Angio doesn't have the injunction

14  anymore.  So I -- I don't see what --  I don't know --

15           THE COURT:    Then let them do that.

16           MR. ROSNER:    But that's essentially what's

17  happening here.

18           THE COURT:    No, that's not essentially --

19           MR. ROSNER:    Why --

20           THE COURT:    -- what's happening.

21           MR. ROSNER:    But why is -- it's -- it's --

22           THE COURT:    Because they're not -- because they're

23  not selling the license agreement to them.

24           MR. ROSNER:    They're giving the --

25           THE COURT:    If they were selling the license

1  agreement to them, then Angio would have the burdens as well as

2  the benefits of the license, wouldn't they?

3         MR. ROSNER:   No, they'd be selling -- in other

4  words, there are two pieces; so outside of bankruptcy the

5  debtors could have done a transaction with Angio where they

6  sold Angio the company and sold Angio or even licensed Angio

7  just the Min rights, let's say; and because they're in default

8  under the --

9         THE COURT:   But according to intellectual property

10 counsel they'd be responsible for a royalty then.

11        MR. ROSNER:   No, right, but what -- but -- am I --

12 well, let me finish and let me see if I'm wrong; but I think

13 they can sell the assets and sell the Min patent because they

14 know that they're in default under the Endolaser license and

15 would -- and that license would be terminated because of the

16 default; but the buyer doesn't want or need that license, so

17 Endolaser terminates the license.

18        THE COURT:   I hear what you're saying, Mr. Rosner.

19        MR. ROSNER:    I don't understand why this is any

20 different.

21        THE COURT:   Yes, you do.  You well understand it,

22 but you're representing a client, and I can accept that; but

23 let's not waste any more time on it.  You understand what I'm

24 saying, and I well understand what you're saying.

25        Now do you want to -- did I misunderstand Mr. --

1          MR. ALBERT:    Michael Albert.

2          THE COURT:    -- Albert, what you told me earlier?

3          MR. ALBERT:    I'm not sure, Your Honor.  I think

4  possibly.   The -- the company, as I think Mr. Rosner

5  indicated, does have the power to license Angio or anyone else

6  to practice this invention, solely based on the fact that it

7  has the Min rights.  It doesn't need the Endolaser rights in

8  order to be --

9          THE COURT:    I know it doesn't.  We had this

10  discussion already.  But it has them.

11          MR. ALBERT:    Yes.

12          THE COURT:    And I asked you specifically, in the

13  face of the fact that they have a responsibility to

14  commercially reasonably use ef -- commercially reasonably

15  efforts to license, that's what the agreement apparently

16  requires of them.

17          MR. ALBERT:    Yes, Your Honor.

18          THE COURT:    Can they cut them out of their royalty

19  by just licensing them under the Min rights, to the detriment

20  of -- and not -- not pay a royalty?

21          MR. ALBERT:    Well -- well, let me separate what's

22  commercially reasonable, which is not something I'm speaking to

23  because that's outside my area of expertise.  From what's

24  permitted under intellectual property law, clearly under

25  intellectual property law they do have that right.

```
 1            THE COURT:   But you acknowledge that it may well be
 2  a breach of a contract or a license agreement.
 3            MR. ALBERT:   That I don't know.
 4            THE COURT:   Okay, fine.
 5            MR. ALBERT:   I can't speak to that.
 6            THE COURT:   Fine.  Okay.  All right.
 7            MR. ROSNER:   So, Your Honor, we do -- we do support
 8  the sale, because the --
 9            THE COURT:   Well, do you su -- would you support the
10  sale if it created millions of dollars of claims in Endolaser
11  for post-petition actions?
12            MR. ROSNER:   I'm not sure how it would create --
13            THE COURT:   I'm not asking you to -- I'm just -- I'm
14  giving you a hypothetical.  If substantial claims were created
15  by this transaction and it created rights against the debtor
16  which were administrative claims, how would you feel about it
17  then?
18            MR. ROSNER:   Well, Your Honor, that's why -- I
19  think that's why Section 365 is there, to allow the debtor to
20  reject a contract that would create that type of liability.
21            THE COURT:   I'll sign off on the rejection right
22  now, but effective now.  It's what the debtor proposes to do in
23  between that's the problem.  I mean, you know, and they -- Mr.
24  Freedlander cites to me designation rights as a -- as precedent
25  for this sort of thing.  Well, you know, designation rights
```

1 aren't mentioned in the Code either, and there's a substantial

2 group of people that think that that's a lot of baloney.

3          MR. ROSNER:    The --

4          THE COURT:    This selling to a third party rights

5 that the debtor has, and that's not even what we're proposing

6 to do here.

7          MR. ROSNER:    No, there are -- there is precedent

8 for either conditional rejections or even rejections that are

9 effective subsequent to entry of the order.

10         THE COURT:    Well, I --

11         MR. ROSNER:    And I don't think that's something

12 that's un --

13         THE COURT:    But in most of those situations there's

14 not this kind of activity that's going to happen.  I mean, the

15 -- you don't -- you do recognize that waiving this injunction

16 has major impact potentially on Endolaser.

17         MR. ROSNER:    I actually don't, because I don't -- if

18 -- if the buyer --

19         THE COURT:    Well, Angio obviously thinks so, or it

20 wouldn't be demanding it.

21         MR. ROSNER:    Right.  I know Angio thinks so, but

22 I --

23         THE COURT:    And they're much closer to the situation

24 than either one of us is.

25         MR. ROSNER:    But I -- but in discussing it with our

1 intellectual property attorneys, what I'm missing is the link

2 between, well, if Angio is licen -- has lice -- been licensing

3 the rights to use the 7-7 -- 7-7-7 patent --

4            THE COURT:   Going forward --

5            MR. ROSNER:    -- how can they be violating an

6 injunction against an infringement?

7            THE COURT:   It's not an issue going forward once

8 they have the license; it's going back.  That's the only -- if

9 everybody's intellectual property counsel are right that they

10 can get a license just by virtue of the ownership of the Min-

11 derived rights, then it's only for the back period.

12           MR. ROSNER:   Well, the back --

13           THE COURT:   And obviously, Angio's worried about it

14 because otherwise they wouldn't care.

15           MR. ROSNER:    The back period is a claim, okay, of

16 Diomed.  Now I don't think --

17           THE COURT:   Well, it --

18           MR. ROSNER:    -- I don't understand why the licensor

19 would have a claim for infringement a year ago when it never

20 had the rights with respect to bring that infringement action a

21 year ago.

22           THE COURT:   Well --

23           MR. ROSNER:    So I -- so I've actually -- I don't

24 quite unders -- you know, I don't --

25           THE COURT:   Well, I -- it doesn't matter whether you

1  understand or whether I understand --

2         MR. ROSNER:    Understand or agree.  I don't agree

3  with what -- what Angio --

4         THE COURT:   So you're willing to take that risk.

5         MR. ROSNER:    I don't think it rises to the level of

6  an administrative claim against the estate upon rejection.

7         THE COURT:   So you're willing to take the risk that

8  you're wrong.

9         MR. ROSNER:    Yes.

10         THE COURT:   Okay.  Anybody else want to be heard?

11         MR. BADDLEY:   If I could be heard for just a moment.

12         THE COURT:   We have another interested party who's

13  got eleven million --

14         MR. BADDLEY:   Thank you.

15         THE COURT:   -- or ten million or whatever number

16  million involved.  Please identify yourself for the record.

17         MR. BADDLEY:   David Baddley from Greenberg Traurig

18  on behalf of the subordinated secured creditors.

19         Judge, real quick, I would -- maybe I can try to --

20  the way it was explained to me as to why the debtors would have

21  the right to seek to vacate the judgment, because quite frankly

22  my initial thoughts were very similar to Your Honor's, and the

23  way it was explained to me made a little bit more sense, which

24  is prior -- prior to bankruptcy, or say at any time, Diomed had

25  the right to license its interest in the Min piece to anybody.

1  And let's suppose even --

2        THE COURT:  As did Endolaser.

3        MR. BADDLEY:  Yeah, and even supposing Endolaser had

4  never assigned any rights to Diomed, Diomed could have done

5  that, okay?  A license right is basically a right to infringe.

6  There's no difference than -- no practical difference between

7  allowing someone to infringe by granting them a license and

8  allowing someone to infringe by vacating an injunction that

9  prohibits them from infringing.  If you read --

10        THE COURT:  But right -- now you would agree that at

11  least from the grant of the injunction to its being vacated, if

12  there was an infringement, Angio would be responsible.

13        MR. BADDLEY:  Yes.

14        THE COURT:  So you would agree that if a waiver of

15  that injunction --

16        MR. BADDLEY:  Well, the reason is why, because at

17  that time neither Diomed had given any rights to Angio nor

18  Endolaser, but --

19        THE COURT:  But Diomed's not proposing to give them

20  *nunc pro tunc* rights.  They're giving them rights as of the

21  closing.

22        MR. BADDLEY:  Right.  And the problem is is that

23  Endolaser would want to read the injunction as basically

24  depriving Diomed of the right to license its rights to Angio.

25  I mean, Diomed goes out and gets this injunction that prohibits

1 Angio from violating the patent.  Now they want to say,

2 "Diomed, when you did that, you basically waived your right,

3 and now .." --

4          THE COURT:  Well, what they're saying is, "We

5 forgive you."  Because they're going to give them a covenant

6 not to sue, combined with a waiver of the injunction --

7          MR. BADDLEY:  Which it --

8          THE COURT:  So they're forgiving all past sins.

9          MR. BADDLEY:  Right.  But to read the injunction as

10 somehow depriving Diomed of the right to license this stuff to

11 Angio, which they could have done anyway, I think is reading

12 the injunction too far.

13          THE COURT:  No, but -- well, but they didn't.  They

14 chose not to.

15          MR. BADDLEY:  That's right.

16          THE COURT:  Now they're choosing to undo what

17 they've -- what has happened in the past.

18          MR. BADDLEY:  That's correct.

19          THE COURT:  But they're undoing it, not just as to

20 them, but they're undoing it as to the other people that they

21 had a commercially reasonable -- a commercial -- had to use

22 commercial reasonable efforts to protect and to license.

23          MR. BADDLEY:  That's right.  And by -- by agreeing

24 to release the injunction, it's no different than putting

25 Diomed exactly where they were beforehand, which is, "I have

1  the right to license this to whoever I want."

2          THE COURT:   But you're not putting Endolaser where

3  they were before, right?

4          MR. BADDLEY:   Well, Endolaser had -- would have been

5  subject to any license that Diomed would have done -- I mean,

6  you know, Diomed always had the right to give Angio the right

7  to do this, and --

8          THE COURT:   Yeah, but they undertook a duty to use

9  certain kind of efforts, so at worst it's a breach of contract.

10          MR. BADDLEY:   Well, I guess the issue --

11          THE COURT:   At best really it's a --

12          MR. BADDLEY:   I guess the issue is do you read that

13  duty as actually depriving Diomed of the ability to license

14  these rights --

15          THE COURT:   In violation of the contract?  If I'm a

16  court, why would I countenance that?  Now they could have done

17  it and breached the agreement, but apparently they chose not

18  to.  And now what you're saying is -- what you seem to be

19  suggesting is I should bless what appears to me to be a

20  violation of their contract.  I should enter a court order

21  saying it's okay.

22          MR. BADDLEY:   Well, I --

23          THE COURT:   And then cut off all the rights of the

24  person who may have been harmed.

25          MR. BADDLEY:   I guess I don't see how, in any way,

1  this could be viewed as a violation of the agreement.  Again,

2  if Diomed has the right --

3          THE COURT:   They *didn't* have the right --

4          MR. BADDLEY:   No.  If Dio--

5          THE COURT:   They exercised their rights to do

6  something else, and now they're being bought off to undo what

7  they did is really what -- what this amounts to.

8          MR. BADDLEY:   I -- I just -- again, my view of this

9  is that when Diomed seeks to enforce the patent and get an

10  injunction, you know, try and prohibit infringement --

11          THE COURT:   And they did it.

12          MR. BADDLEY:   Right.  -- the purpose of that was to

13  make sure that someone that didn't have license rights didn't

14  keep infringing.  Now did the effect of the injunction also

15  means that on a go-forward basis, Diomed is precluded from

16  licensing its right to Angio --

17          THE COURT:   No.

18          MR. BADDLEY:   -- which -- which it always had the

19  right to?

20          THE COURT:   No.

21          MR. BADDLEY:   And to me, that would --

22          THE COURT:   But they're giving up other people's

23  rights at the same time, not just theirs.

24          MR. BADDLEY:   And Endolaser --

25          THE COURT:   And Mr. Freedlander is having a fit

1 because he's going to tell me that they -- that Endolaser gave

2 up that right.

3          MR. FREEDLANDER:   No.

4          MR. BADDLEY:   Well, Endolaser never had the right to

5 prohibit Diomed from licensing its Min rights to --

6          THE COURT:   But they had a-- but they --

7          MR. BADDLEY:   -- Angio.

8          THE COURT:   But they did have a right to insist that

9 Diomed abide by their licensing agreement.

10          MR. BADDLEY:   They did.  Sure.

11          THE COURT:   And Diomed *did* abide by the license

12 agreement.  They don't get a do-over of that.  They fulfilled

13 their rights; now they're undoing what they did.  That's the

14 way I see it.  But Mr. Freedlander's having what my kids would

15 call a conniption.

16          MR. BADDLEY:   I tried.

17          MR. FREEDLANDER:   Your Honor, I think there is a

18 conceptual misunderstanding.

19          THE COURT:   Well, maybe there is.

20          MR. FREEDLANDER:   I believe so, and I'd like to try

21 to correct it.  Your Honor, today the proposed purchaser Angio

22 is not infringing on the 7-7-7 patent.  In fact, Your Honor, if

23 you take a look at paragraph 11 of the Angio objection, they

24 say just that.  I'll read you paragraph 11.

25          THE COURT:   Go ahead.

1          MR. FREEDLANDER:   It's only a sentence.

2          "Since entry of the permanent injunction, Angio has

3          ceased infringement of the 7-7-7 patent, instead

4          selling products that rely upon an alternative and

5          non-infringing modification of the procedures."

6    So this is not at all, Your Honor, forgiveness to Angio of this

7    supposed ongoing infringement.  One of the major assets that

8    this company proposes to sell to Angio is inventory --

9    inventory that is subject to the 7-7-7 patent.

10          So somehow, some way, Your Honor, Angio needs the

11   ability to sell this inventory, subject to the 7-7-7 patent.

12   We're proposing to give them a license, Your Honor, so that

13   they can sell that inventory.  Again, there's an initial --

14          THE COURT:   Well, you're proposing to give them --

15   you're not just giving them a license to sell *that* inventory.

16          MR. FREEDLANDER:   We're giving them a license --

17   that is true.

18          THE COURT:   You're giving them a license to sell --

19   to use it wherever they want.

20          MR. FREEDLANDER:   Yeah, but -- I can't deny that.

21   Absolutely, positively.  But --

22          THE COURT:   So if they like the 7-7-7 technology

23   better than their work-around --

24          MR. FREEDLANDER:   Yes.

25          THE COURT:   They can use it once they -- once this

1  deal closes.

2          MR. FREEDLANDER:  Unquestionably they could.  But
3  what I thought I heard the Court expressing concern about, this
4  is not a free pass.  You've -- in the own papers filed by
5  Endolaser they suggested today, as a result of this work-
6  around, there is not ongoing infringement.  Now it could very
7  well be the case that Angio likes this 7-7-7 technology better.
8  I don't know.  But that -- unquestionably that could be the
9  case, and unquestionably this license that we propose to give
10 would allow them to do that forever.  No ands, ifs, or buts
11 about it.

12          But they do it into the future, if they are going to
13 use it into the future, subject to competition, which wouldn't
14 otherwise exist, because by virtue of rejection, Endolaser
15 would obviously be able to likewise license the right to use
16 its technology to all of Angio's competitors.

17           But I just want to make certain, Your Honor, that
18 you have an appreciation for the fact that this isn't --

19          THE COURT:  I appreciate that.  I did not realize
20 that they had acknowledged that.

21          MR. FREEDLANDER:  Yes.  Yes.

22          THE COURT:  So what is the big deal about the
23 injunction then?

24          MR. FREEDLANDER:  Well, I am -- I can only tell you
25 from my perspective -- and Angio is here on theirs.  As I

1  understand it again, Your Honor, the injunction enjoins Angio

2  from violating or utilizing technology that would otherwise

3  violate 7-7-7.  That's what it says.  I don't have the exact

4  injunction in front of me, but in essence that's what it does.

5  We are proposing to license to Angio the right to use this

6  technology.

7           THE COURT:   So the instant they have a legitimate

8  license --

9           MR. FREEDLANDER:   Yes.

10          THE COURT:    -- the injunction -- for all intents

11  and purposes the injunction going forward means nothing.

12          MR. FREEDLANDER:   We -- we -- it is Diomed's belief,

13  after conferring with its intellectual property counsel who is

14  here today -- that they really don't need -- as a matter of law

15  they don't need this injunction to be lifted; but Angio is

16  Angio, and Angio has said, "We're not moving forward with this

17  transaction," and, you know, we heard counsel himself -- I'm

18  not putting words in his mouth -- "We're not moving forward be

19  -- unless and until there is a lifting of this injunction so

20  that we are not violating a federal court injunction."

21          I don't know what to do about that other than to

22  endeavor to do what we're doing, which again is to seek to have

23  the injunction lifted.  I just -- I don't -- but as a matter of

24  law, as I understand it, they don't necessarily need it to

25  protect them.

1          THE COURT:    Would Angio accept a waiver of the

2    injunction effective on the date -- for actions on the date

3    going forward.

4          MR. FREEDLANDER:    I -- Your Honor, that's --

5          THE COURT:    I'm asking the question, and I don't --

6    I mean, if, in fact, they're not infringing, and if, in fact,

7    they've got a valid license, then the only thing they can be

8    worried about is violation of the injunction before they had a

9    license.  So would they agree that the injunction can be lifted

10   prospectively from the date of the sale forward?

11         MR. ZAGRANICZNY:    Well, Your Honor, I -- Joe

12   Zagraniczny for Angio.

13         I believe, Your Honor, that as Mr. Freedlander cited

14   and quoted paragraph 11 from the objection filed by Endolaser,

15   they stated that we did have an effective work-around.  From

16   the perspective of Diomed, they never sought to enforce any --

17   any rights under the injunction, again, because I think they

18   believe we had an effective work-around technology.

19         I -- to address your question point blank, Your

20   Honor, is I would -- Angio wants to be free of litigation.  We

21   can -- as you know, and as has been testi -- the testimony, we

22   can spend a lot of money chasing litigation infringement rights

23   and defending them as well.  And as a result, Your Honor, we

24   would want the injunction to be dissolved, extinguished prior

25   to the closing to make sure that --

1          THE COURT:   Well, it's not going to prior.  It may

2   be simultaneous with --

3          MR. ZAGRANICZNY:   Simultan -- forgive me, Your

4   Honor.  Simultaneously with the closing.

5          THE COURT:   But let me change hats, and I'm the

6   District Judge now.  Counsel, what's the effective date of this

7   termination of the injunction?  Is it retroactive?  Because

8   that's what you're -- that's got to be the only issue left,

9   because you've already told me you're going to have a license

10  going forward, so are you asking me to erase it like it never

11  existed?

12         MR. ZAGRANICZNY:   We are -- we would be asking you

13  to dissolve the injunction, Your Honor.  We have  -- we --

14         THE COURT:   All right, today's June 2nd.  It's

15  dissolved as of June 2nd.  Does that help you at all in what

16  your concern is?

17         MR. ZAGRANICZNY:   Well, we will be receiving a

18  release from Diomed, who is the plaintiff in that action.  So I

19  believe that the only rights that Endolaser would have would be

20  going forward, and we would have a license for which -- which

21  gives us permission and the right to produce the bare-tip fiber

22  lasers going forward, Your Honor.

23         THE COURT:   What's the effective date going to be,

24  counsel, of the covenant not to sue?

25         MR. ZAGRANICZNY:   The same date as the date of

1  closing, Your Honor.

2          THE COURT:  So it's not going to have -- you're not

3  going to have a covenant not to sue retroactive to the closing

4  date of the litigation that you lost, so you still have that

5  exposure, don't you?

6          MR. ZAGRANICZNY:  You're right.

7          THE COURT:  All right, I'm going to take a break,

8  because I need one.

9          MR. ZAGRANICZNY:  Okay.

10         THE COURT:  And I've got a headache trying to

11 understand what -- two years of law school patent courses in

12 about an hour and a half, and with the thought that I think

13 what's happened here is what often happens when you get into

14 complicated things, everybody says, "I need what I need because

15 I need it."

16         But I think what we're beginning to unravel is -- and

17 with the help of Mr. Freedlander and others -- Mr. Baddley and

18 Mr. Rosner -- I'm coming to the conclusion this is much ado

19 about nothing, and if you folks can sort that out yourselves,

20 we may find out that if we can each talk to our clients, we may

21 find that we can resolve this very quickly without anybody --

22 without it costing anybody -- well, everything's costing people

23 money.  Looking around, it's costing thousands of dollars just

24 to sit here.

25         But I'm not sure that these hardened positions are as

1  necessary in the real world.  So let's -- I'm going to take a

2  five- or ten-minute break, stretch my legs a little bit, and

3  maybe we can come back to the real world in a little while and

4  see what's really important.  Thank you.

5          MR. ZAGRANICZNY:   Thank you, Your Honor.

6              [Off the record at 2:37:16 p.m.]

7                  *  *  *  *  *  *  *  *

8              [On the record at 3:08:11 p.m.]

9          MS. MAGEROWSKI:   Please be seated.  Back on the

10 record for Diomed, Incorporated.

11         THE COURT:   Mr. Freedlander.

12         MR. FREEDLANDER:   Thank you, Your Honor.   I am very

13 confident that you have a path that you would like to take.

14 I'm happy to let you know in advance of our following whatever

15 path you wish that the parties have been able to reach

16 resolution of the Endolaser issues that were subject to

17 argument.  We have reduced it to a form of writing in Mr.

18 Dale's handwriting, so I would ask, with the Court's

19 indulgence, that Mr. Dale could just read those terms and

20 provisions of resolution into the record, if that's acceptable

21 to the Court.

22         THE COURT:   Fine.  So they found something for you

23 to do, Mr. Dale.

24         MR. DALE:   Mr. Gooding says it's my highest and best

25 use, Judge.

1          Your Honor, what we've decided to do and agreed upon

2   is the following:  With respect to Section 3.2(k), as amended

3   by the filing made last evening, in Romanette I the world --

4   the word "Worldwide" will be deleted and in Romanette ii after

5   the last word before the semi-colon, after the word "patent" a

6   parenthetical reference will read, "(but not Endolaser

7   Associates, LLC,)"  closed paren -- that'll pick up the

8   concept, Your Honor, that the covenant not to sue is not

9   binding on Endolaser Associates.

10          And then if I may, Your Honor, we've agreed upon

11   riders to both the proposed sale order and to the order

12   rejecting the Endolaser license; and first, with respect to the

13   sale order, the simplest of the additions, Your Honor, would be

14   a paragraph that reads,

15          "Nothing contained herein shall in any way affect the

16          respective rights of the debtors and Endolaser

17          Associates, LLC, in the device, method, and

18          intellectual property covered by U.S. Patent

19          #6398777."

20   With respect to the --

21          THE COURT:  Okay.

22          MR. DALE:  If it please, Your Honor, if you have

23   questions --

24          THE COURT:  Well, we're going to take copies of

25   those--

1          MR. DALE:   Okay.

2          THE COURT:   -- from you.

3          MR. DALE:   Very well.  With respect to the rejection

4  order, Judge, a few longer paragraphs, the first --

5          THE COURT:   Let me -- let me find it so I can -- if

6  I have it here, follow along.  Go ahead.

7          MR. DALE:   That was a very short order.   Your

8  Honor--

9          THE COURT:   Yeah, I was surprised.

10          MR. DALE:   The first paragraph will read -- the

11  first insertion, rather, will read rejec --

12          THE COURT:   Where does it go, first?

13          MR. DALE:   I think it goes right after that one

14  substantive paragraph in the proposed order.

15          THE COURT:   Okay.

16          MR. DALE:   [Reading]

17          "Rejection of the license agreement shall be

18          effective immediately prior to consummation of the

19          approved sale of assets to AngioDynamics, Inc."

20  In parentheses:

21          "(That will be defined as 'the closing')."

22  The second paragraph will read:

23          "The automatic stay shall be terminated upon

24          rejection to permit Endolaser to take any action it

25          deems necessary to protect its interests in the

1             intellectual property covered by the license

2             agreement, provided, however, following the closing

3             there will be three caveats:"

4  The first:

5             "Endolaser will not oppose any effort by the debtors

6             and Angio to obtain a dissolution of the permanent

7             injunction entered against Angio by the United States

8             District Court for the District of Massachusetts."

9  The second caveat:

10            "Endolaser will acknowledge and respect the license

11            of rights obtained by Angio under Section 3.2(k), as

12            amended, of the asset purchase agreement approved by

13            the Bankruptcy Court."

14 And the third caveat:

15            "Endolaser will assert its monetary claims under the

16            license agreement in the Bankruptcy Court."

17            THE COURT:   Say that -- read that one back to me

18 again.

19            MR. DALE:   [reading]

20            "Endolaser will assert its monetary claims under the

21            license agreement in the Bankruptcy Court."

22 That paragraph generally would give us relief from stay

23 attendant to the license agreement and the intellectual

24 property, Your Honor.  Things like intervening and pending

25 intellectual property actions are the things that the parties

1  contemplate we would be doing outside of this Court; but with

2  respect to monetary claims --

3          THE COURT:   Monetary claims against whom? Are you--

4          MR. DALE:   Against the debtor.

5          THE COURT:   Okay.  Is it clear that that's -- in

6  context, that that's claims against the debtor?

7          MR. DALE:   That's -- that's what is intended, Your

8  Honor, I believe.

9          THE COURT:   Well, I just don't want to agree to take

10 jurisdiction claims against other people other than people

11 party to this transaction.

12         MR. ZAGRANICZNY:   And with your permission, Your

13 Honor, if you could add the words "against the debtor," as we

14 did the other paragraph --

15         MR. DALE:   Happy to do that, Your Honor.

16         MR. ZAGRANICZNY:   -- that would be great.

17         MR. DALE:   There is another paragraph that makes

18 that more clear.

19         THE COURT:   Fine.  Okay.

20         MR. DALE:   The last paragraph that we would propose

21 to add -- oh, forgive me.  Two more paragraphs that we would

22 propose to add:

23             "Nothing contained herein shall affect the claims

24             that may be asserted by Endolaser against the

25             debtors, including a contract rejection claim and

1            claims for administrative priority expense under

2            Section 503(b) of the Bankruptcy Code."

3    Final paragraph we would propose to add to the rejection order,

4    Your Honor, would read:

5            "The debtors and Endolaser shall cooperate and take

6            all actions reasonably necessary to revest in and

7            return to Endolaser its undivided interest in the

8            7-7-7 patent,"

9    -- and what's intended there, Your Honor, -- and I've got to

10   wordsmith this correctly -- is that the debtor is going to

11   cooperate with us in giving us back *our* undivided interest in

12   the 7-7-7 patent.  And with those changes, Your Honor, I think

13   we are all in agreement.

14           THE COURT:   Well, let me just ask one question.

15           MR. DALE:   Please.

16           THE COURT:   On that last one about Endolaser and the

17   debtor, all right, it's not being assigned -- well, they're

18   just getting a license, so it's -- Angio won't have anything to

19   do with revesting.  Okay, that's fine.

20           MR. DALE:   That's correct.  Thank you, Your Honor.

21   Is --

22           THE COURT:   All right, now let me ask you, who is

23   going to -- we'll do it if -- I mean, if it's necessary.  We

24   have these orders by e-mail now.  I'm not sure, because I think

25   McGuire Woods has been docketing them, not -- in PDF form, not

1  e-mailing them to our e-mail address.

2          MR. FREEDLANDER:   Your Honor, if I may for a moment,

3  please.  Again, for the record, I'm Mark Freedlander.

4          The sale order was e-mailed to the Court's --

5          THE COURT:   The sale order we have.

6          MR. FREEDLANDER:   Yes.   We can --

7          THE COURT:   The others I don't think we have been

8  e-mailed.  I think they were filed, but not e-mailed.

9          MR. FREEDLANDER:   They were filed, but with a quick

10  caller e-mail, I can see to it that they are immediately all so

11  provided to the Court by e-mail.

12          THE COURT:   Fine.  Because I want to make sure these

13  get on record --

14          MR. FREEDLANDER:   Yes.

15          THE COURT:   -- no later than tomorrow.

16          MR. FREEDLANDER:   The one point I want to make to

17  the Court is that we are fine with respect to that that Mr.

18  Dale read into the record.  There should be on addition that I

19  know I spoke of to Mr. Dale prior to his reading it, but it

20  didn't quite make it in.  The next to the last paragraph where

21  Endolaser --

22          THE COURT:   Next to the last paragraph of which

23  order?

24          MR. FREEDLANDER:   Of the rejection order, where

25  Endolaser is to assert -- it reserves the right to assert

1  claims in and against the debtors bankruptcy estate.  It should

2  likewise provide that the debtor reserves all rights relating

3  to those claims as well.

4            THE COURT:   Make that change, please, Mr. Dale.

5            MR. DALE:   Yes, absolutely, will do, Your Honor.

6            MR. FREEDLANDER:   Yes.

7            THE COURT:   Fine.  All right, so at the conclusion

8  of the hearing, please give them to Ms. Magerowski.  She'll

9  make copies and return them to you, and then we'll have them so

10  we can make the changes.

11           MR. DALE:   Very well.

12           THE COURT:   All right.  So that takes care of the

13  fight.

14           MR. FREEDLANDER:   It does.

15           THE COURT:   Now let me ask, does anyone have any

16  objection to any other language in the order?  I've heard none,

17  but here's Mr. Rosner to give me some more objections.  Okay.

18           MR. ROSNER:    No, it's not an objection.  It's a

19  reservation of rights.   Douglas Rosner for the Creditors'

20  Committee, and this has been discussed with the parties.  The

21  Committee would like to add to the order --

22           THE COURT:   To which order now -- let's --

23           MR. ROSNER:    The sale order, Your Honor.

24           THE COURT:   Okay, where?

25           MR. ROSNER:    I mean, it could go in --

1          THE COURT:    Do you have language?  Because at 3:20

2  -- when I've been reading pleadings all night because I watch

3  my Blackberry all night to make sure that I don't miss

4  anything.

5          MR. ROSNER:    It can go in paragraph 24, Your Honor,

6  or somewhere else in the order.

7          THE COURT:    All right.

8          MR. ROSNER:    Paragraph 24 deals with the buyer

9  having an administrative claim.  What we want to do is just

10  reserve our rights with respect to the interpretation of

11  Sections 2.4 and the hold-back provisions in the asset purchase

12  agreement, as well as administrative claims with respect

13  thereto.

14          And this arises out of -- we believe that there is a

15  question about how the purchase price adjustment is paid *vis-á-*

16  *vis* the hold back.  We think it should be paid out of the hold

17  back first.  Angio believes that it shouldn't.  But the issue

18  becomes moot --

19          THE COURT:    This is vaguely familiar.  We've had

20  this discussion.

21          MR. ROSNER:    Yes.  The issue becomes moot if there

22  are no indemnity claims.  So instead of fighting about it now,

23  if six months from now there are no indemnity claims --

24          THE COURT:    So give me the language that you want.

25  Don't make me work out of this -- I want to make you happy, Mr.

1 Rosner.

2          MR. ROSNER:    Thank you, Your Honor.

3          THE COURT:    So the way I'm going to make you happy

4 is I'm going to have *you* provide the language.

5          MR. ROSNER:    So I can either write it and submit

6 it.

7          THE COURT:    You will write it and leave it.  Okay.

8          MR. ROSNER:    Okay, that's fine.

9          THE COURT:    Fine.  Anybody else have any -- any

10 comments on the order?  All right.  What else do we have to

11 deal with today, Mr. Freedlander?

12          MR. FREEDLANDER:    Your Honor, I am -- there are two

13 things:  The first is I understood that the Court had its own

14 comments and concerns as it relates to the sale order.  I have

15 to ask how it is that the parties are to become aware of those

16 comments and address the --

17          THE COURT:    When you get the order.  It's my order,

18 of course.

19          MR. FREEDLANDER:    Yes, it is.

20          THE COURT:    They're mostly nits and picks, a few

21 typos, a few references to representations that have been made

22 to the Court.  I am not going to issue -- I am not giving an

23 opinion that all necessary corporate action will be to the

24 sellers has taken place.  I will give a representation that all

25 actions by the Court have been done.  They'll have to figure

1  out what your by-laws and charter require if it's important to

2  them.  Things of that ilk.

3          MR. FREEDLANDER:  Okay.

4          THE COURT:  The debtors are -- there's a provision,

5  for example, that,

6          "Debtors at closing will cure by payment of approved

7           cure costs, or establish"

8   -- it says "a reserve."  I want the debtor to establish a *cash*

9  reserve.  I don't want a book -- bookkeeping reserves don't pay

10 bills.  Cash pays bills.

11         MR. FREEDLANDER:  It's not even necessary, Your

12 Honor, because there were  --

13         THE COURT:  No objection.

14         MR. FREEDLANDER:  -- no objections.

15         THE COURT:  Okay, good.

16         MR. FREEDLANDER:  The only other thing, Your Honor--

17         THE COURT:  An escrow provision under -- I -- some

18 of these we discussed.

19         MR. FREEDLANDER:  Mmhmm.

20         THE COURT:  For the 1146 claims, if there are any, I

21 think you're pretty sure, I think, that there aren't.

22         MR. FREEDLANDER:  Correct.

23         THE COURT:  But things such as that.

24         MR. FREEDLANDER:  Okay.

25         THE COURT:  And what I will do, I will extend the

1  same courtesy to the lawyers that they usually extend to me,

2  and when we put the order on the docket, we will put both a

3  black-line and a clean copy on.

4          MR. FREEDLANDER:  I understood.

5          THE COURT:  So you'll know, and you can look for the

6  changes.  I'm not trying to hide anything --

7          MR. FREEDLANDER:  I understand.  I would also --

8          THE COURT:  And part of it was, I didn't want a

9  draft -- because I didn't know where we were coming out on this

10 thing.

11         MR. FREEDLANDER:  Right.  I get it.

12         THE COURT:  And the weather was awfully good two of

13 the three days of the --

14         MR. FREEDLANDER:  It has been pretty nice.

15         THE COURT:  Well -- and so, I mean, there were other

16 things on my  mind.

17         MR. FREEDLANDER:  That's good for you.  I'm glad.

18 Your Honor, the only other point is, I would ask is, as the

19 Court makes modifications, that the order specifically refer to

20 the fact that the Endolaser objection has been withdrawn as

21 well, which --

22         THE COURT:  Well, it's either been withdrawn -- is

23 it being withdrawn provided these changes are made, Mr. Dale?

24         MR. DALE:  Withdrawn or resolved, Your Honor.

25 Whatever is your pleasure.

1          THE COURT:  So withdrawn or resolved.  Okay.  Very

2  good.  All right.  What else can we do today?

3          MR. FREEDLANDER:  I understand as well, Your Honor,

4  the buyer has requested -- and I believe it's acceptable to

5  debtors or sellers as well -- that the closing occur on the

6  16th of June.

7          THE COURT:  Is that necessary in the order?

8          MR. FREEDLANDER:  Well, it is.  We could do it one

9  of two ways:  We can always submit a written amendment to the

10  underlying agreement to the Court; or instead, by virtue of

11  this order, the agreement could be amended.  The deadline was

12  the 13th, in accordance with the underlying asset purchase

13  agreement.  And I thought rather than --

14          THE COURT:  So do you want me to order that deadline

15  is extended until the 16th?

16          MR. FREEDLANDER:  Please.

17          THE COURT:  Everybody agree?  Any objections?  All

18  right.  Anything else?

19          MR. FREEDLANDER:  As to the sale, no, Your Honor.

20  If you will recall, at our last hearing last week, that was to

21  be the time and place --

22          THE COURT:  Your clients are much happier now than

23  they were an hour ago.  I want you to know that.

24          MR. FREEDLANDER:  Yeah, they like me a drop more.

25          THE COURT:  There are two gentleman over your right

1   shoulder with big smiles on their faces.

2           MR. FREEDLANDER:   Uh-huh.  I understand.  That's the

3   ebb and flow.  Sometimes they like me, sometimes they don't.  I

4   get it.

5           THE COURT:   Well, I didn't say they don't -- I said

6   they were happy.  I didn't say they liked you, Mr. Freedlander.

7   (Laughter)

8           MR. FREEDLANDER:   Those are two very different

9   things.  That's true.

10          THE COURT:   I only will make decisions that I have

11  to make, not --

12          MR. FREEDLANDER:   I understand.  They're happier

13  with me at the moment than they may have been in the past.

14  That's fair comment.

15          Cash collateral, Your Honor, was scheduled for last

16  week, adjourned until today.  I would ask Your Honor, again

17  provided that parties in interest don't object, that that

18  simply be adjourned as well.

19          THE COURT:   Adjourned or use extended?

20          MR. FREEDLANDER:   Well, no, because the existing

21  order is in effect until the 13th of June.  I think what makes

22  the most sense, Your Honor, is to adjourn for the moment, and

23  we'll likely need to file something of record extending; but I

24  don't have all the parties here.

25          THE COURT:   Okay.  Fine.

1          MR. FREEDLANDER:   Okay.

2          THE COURT:   Anything else?

3          MR. FREEDLANDER:   Not on behalf of the debtors, Your

4   Honor.

5          THE COURT:   Anything else?  All right, Ms. Maher,

6   are you still on the line?

7          MS. MAHER:  Yes, I am.

8          THE COURT:   All right, in your request today for a

9   telephonic hearing -- to appear by telephone, you indicated

10  that you wished to speak the other day, but things went so

11  quickly you didn't have an opportunity to speak.  Is there

12  something you want to say today with respect to the

13  proceedings, both on last Thursday and as continued today?

14         MS. MAHER:   Yes.

15         THE COURT:   Go ahead.  Everybody can hear you.

16         MS. MAHER:   Okay.  First of all, thank you for

17  letting me be there sort of this way.  It's hard, because I

18  don't have the visual.  I just have -- trying to hear all of

19  the legal language and so forth, and I have a cadence of the

20  two days, and I'm an artist, and I draw pictures; and the only

21  time I buy stock, the very little I buy, usually has to do with

22  something my husband had read about some sort of medical device

23  or something that will help people later on, hopefully.

24         And I'm -- after two days of listening, it's amazing

25  to me the minds that are in the room, the education and the

1  really genius in the room between -- between what legally is

2  happening and the scientists and the business people.  And I

3  think because I think not like a lawyer -- I think like an

4  artist -- I think of the guy, the original guy sitting with his

5  -- in his room making up this thing which later becomes Patent

6  7-7-7, and I think of him being excited about it and telling

7  the next person, and it becomes a company; and then all the

8  other stuff, which is very confusing to me, comes along and

9  sidetracks.

10        And I read a little bit about AngioDynamics, and it

11 seemed to me that that company incorporates people from the

12 prior companies that they've bought, and I thought, "Well,

13 good, then the Diomed people will have work," and in the end I

14 -- I -- I don't really know what's going to happen.  Most of me

15 doesn't want to Diomed to disappear into pixie dust, and I

16 suppose that's what's happening.

17        It's important because these things that you're

18 fighting about, if you were collaborative with each other,

19 without ego, which is pretty hard, and not fighting over money,

20 it's amazing what could happen.  And as an artist, when I

21 collaborate with other artists, it -- it gives more, it makes

22 more, it creates more rather than less.

23        And so thank you for letting me hear this.  I

24 appreciate the efforts of everyone that I've heard and been

25 able to understand.  I don't understand the legal language, but

1  I can hear the vibration of your voice, as you can mine, and

2  it's -- I'm very nervous talking to you.  You can hear that.

3          THE COURT:   You're doing fine.  I'm nervous talking

4  to artists, to be honest with you.

5          MS. MAHER:   Thank you.  So I -- I don't -- I don't

6  know, other than that.  I think that the bottom line to all of

7  -- all of what's happening -- my sister is ill right now.

8  She's -- I'm 58 and she's two years older, and she's had a

9  blood clot and very sick now.  She's in Texas.  And I realize

10 that with the beginning of this device and the collaboration of

11 the other scientists and the other business people and good

12 legal people, you need all of those people in order to work

13 together, instead of losing the energy and wasting the time

14 that's happening, it's sort of our human condition -- we do

15 that.  But thank you very much for letting me speak and letting

16 me be there.

17         THE COURT:   Well, you're very welcome, Ms -- you

18 know, if you -- I would have liked you to have been here

19 because you might have drawn some very interesting pictures.

20         MS. MAHER:   Okay.

21         THE COURT:   Just to give you a little insight, if

22 it's helpful -- and I hate to be bearer of the bad news, as I

23 often am, but I think it's highly unlikely that the

24 shareholders such as yourself will see any recovery in this

25 situation.  I suspect you realize that, because you've

1  obviously been reading the papers fairly carefully as you

2  receive them.

3          With respect to the system and the argument and

4  whatever, unfortunately or fortunately, depending on your

5  viewpoint at any particular time, these proceedings are

6  adversarial in nature.  Different people have different

7  viewpoints driven by the economic realities for each of their

8  clients, and actually this was rather tame and rather polite,

9  compared to others that I've been -- and you may be interested

10  to note that we don't even have security in the courtroom

11  today.  So that's a good sign.

12          I wish you and your family well -- you and your

13  sister in particular; and if there's nothing else, we'll

14  conclude the hearing for today.

15          MS. MAHER:   Thank you very much.

16          THE COURT:   Thank you all.  And I do congratulate

17  the parties on coming to a resolution.  Any resolution that you

18  come to is far better than any that I would have imposed.

19          Would you make sure that Ms. Magerowski gets the

20  documents so that you can make full copies, and make sure

21  they're good copies, too.  Thank you.

22          ATTORNEY:  Thank you, Your Honor.

23  (End at 3:28:52 p.m.)

24              * * * * * * * * * * *

25

1          I certify that the foregoing is a true and accurate

2     transcript from the electronically sound recorded record of the

3     proceedings.


_____          Date

GLORIA C. IRWIN
Certified Transcriber NJ AOC200
      Federal  CERT #122
GCI TRANSCRIPTION SERVICES
210 Bayberry Avenue
Egg Harbor Township, NJ  08234-5901
609-927-0299   1-800-471-0299
      FAX  609-927-9768
e-mail  irwingloria@comcast.net